# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ZILA, INC., a Delaware
Corporation,
          *Plaintiff-counter-defendant-*
                        *Appellee,*

          v.

JAMES E. TINNELL,
          *Defendant-counter-claimant-*
                    *Appellant.*

No. 05-15031

D.C. No.
CV-00-01345-KJD

ZILA, INC., a Delaware
Corporation,
          *Plaintiff-counter-defendant-*
                        *Appellant,*

          v.

JAMES E. TINNELL,
          *Defendant-counter-claimant-*
                    *Appellee.*

No. 05-15087

D.C. No.
CV-00-01345-KJD

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
December 8, 2006—San Francisco, California

Filed September 5, 2007

Before: Dorothy W. Nelson, Robert E. Cowen,* and
Marsha S. Berzon, Circuit Judges.

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

11687

Opinion by Judge Berzon

**COUNSEL**

Larry C. Johns and John H. Pilkington, Las Vegas, Nevada, for the appellant.

William H. Drummond, Newport Beach, California, for the appellee.

## OPINION

BERZON, Circuit Judge:

Appellant James Tinnell developed a liquid solution to treat lesions caused by the herpes virus. He applied for a patent on the treatment and acquired a defunct corporation, now named Zila, as a vehicle for marketing and selling the product, now called Zilactin. Tinnell subsequently entered an agreement with Zila that assigned all rights in his invention to the company in return for royalty payments and company stock. The royalty payments provided for in this contract are the subject of the present dispute.

The contract at issue is unambiguous as to the duration of the royalties, and the parties agree on their intent at the time it was formed. All the evidence is thus in accord with a single interpretation — that Tinnell would relinquish all rights to Zilactin, patent or otherwise, and, in return, receive in perpetuity a five percent royalty on Zila's sales of the invention. The difficulty in this case arises because Zila asserts, and the district court agreed, that the doctrine announced in *Brulotte v. Thys*, 379 U.S. 29 (1964), displaces, because of federal patent policy, the parties' intent and renders the royalty obligation unenforceable, either entirely or upon the expiration of the first patent that issued on Tinnell's invention. We confront, consequently, not simple questions of contract law but rather issues concerning the impact and bounds of *Brulotte,* in the context of an otherwise unremarkable case.

## I.

Tinnell first developed his liquid solution to treat lesions

caused by oral and genital herpes in 1976. He applied for a patent on the treatment the following year and soon thereafter acquired a defunct California corporation, which he renamed Zila, Inc.,[1] as a vehicle for marketing and selling the product. The product has been improved since it was developed in 1976 and is now sold under the brand name Zilactin.

On September 5, 1980, Tinnell and Zila entered into an agreement ("1980 Agreement") that began by noting that "Tinnell has invented a treatment composition for herpes virus infection, which is the subject of a patent application," and "Tinnell is desirous of assigning all of his right, title and interest in the application and invention, improvements thereon and Letters Patent thereon" for consideration including royalties and stock. The 1980 Agreement

> assign[ed] all of [Tinnell's] right, title and interest in the [patent] application and invention, improvements thereon and Letters Patent thereon, when granted in the United States or foreign countries, to [Zila], including any present or future improvement whether the same being made by Tinnell or [Zila], and whether presently existing or made in the future, and as may be granted in the United States or any foreign country or otherwise, including each patent granted on any application which is a division, substitution or continuation of any of the applications specifically identified herein, and each reissue or extension of any of the same.

In return, and without any temporal or other limitation, the contract provided Tinnell with "a five percent (5%) royalty on gross sales of [Zila] of the invention," as well as company stock. Tinnell obligated himself to "cooperate with [Zila] to

---

[1]We refer to the corporation throughout this opinion as Zila, its current name.

the extent that [Zila] may enjoy to the fullest extent the rights conveyed hereunder . . . ."

The officers who signed on behalf of Zila testified that when they executed the 1980 Agreement, it was not known whether any patents would issue on Tinnell's invention. According to their uncontested statements, the duration of Zila's obligation to pay Tinnell royalties was not related in any way to the patents that might or might not be obtained by the company as a result of his previously-filed patent application. Instead, the signatories understood the 1980 Agreement to provide Tinnell with a 5% royalty on gross sales of Zilactin for as long as the company sold his product.

Zila subsequently secured patents in the United States and Canada.[2] The first of these patents, U.S. Patent '934, was issued in August 1981. Zila also secured a continuation patent, '236, for the 1981 patent and, in December 1985, Canadian Patent '494. The primary improvement that transformed Tinnell's original solution into the present-day Zilactin was the addition of a thickener that made the product into a gel. The patent for the addition of this thickener was approved as U.S. Patent '158 in January 1992.

There is a dispute as to who invented the 1992 patent. In 1987, Zila filed a patent application which described an improvement to the original chemical compound and named Tinnell as the inventor. Because Zila's patent counsel erred in the technical description of the chemical compounds involved, however, the company withdrew the application. When the company resubmitted the application, it inexplicably named Edwin Pomerantz, Zila's regulatory specialist, as the inventor. The patent office subsequently issued the patent

---

[2]The record does not establish whether a patent was obtained in any other country.

in 1992 to Zila, crediting Pomerantz rather than Tinnell with the invention.[3]

Zila's royalties to Tinnell grew exponentially from 1987 to 2000. In 1987, gross sales of Zilactin amounted to only $321,000, which pegged royalties at $6,426. By 2000, however, Zilactin had gross sales of over $8 million, and Zila owed Tinnell half a million dollars in royalties annually.

In July 2000, Zila's patent counsel advised the company to terminate Tinnell's royalties, on the grounds that, under *Brulotte*, Tinnell's right to royalties expired on August 1998, when the 1981 patent expired. Two months later, Zila stopped making royalty payments on all sales of Zilactin. Although the Canadian patent did not expire until December 2002, Zila justified its withholding of the Canadian royalties on the ground that it had overpaid Tinnell nearly a million dollars in American royalties over the previous two years.

Shortly after it stopped paying royalties, Zila filed a two-count complaint in federal court requesting a declaratory judgment that Tinnell's right to royalties under the 1980 Agreement ceased after August 25, 1998. The suit also sought reimbursement for the royalties paid to Tinnell for the two years after the 1981 patent expired. Tinnell filed a counterclaim for declaratory relief, contending that his entitlement to royalties under the Agreement did not terminate with the expiration of the 1981 patent but, instead, continued in perpetuity. He added counterclaims for breach of contract, fraud, and other state law claims.

After discovery, the parties made cross-motions for sum-

---

[3]Section 111 of the Patent Act, 35 U.S.C. § 1 et seq., requires inventors either to apply for the patent or to authorize the application. When the patent issues, however, the Patent and Trademark Office can grant it under § 152 to an assignee, such as Zila, and name both the inventor and the assignee on the patent that issues, *see* § 154(a)(1).

mary judgment on the over-arching question of whether royalties were owed after August 1998. Applying *Brulotte*, the district court held that the 1980 Agreement was "unlawful per se under federal patent law," because it "project[ed] beyond the expiration date of the patent." Accordingly, the district court granted summary judgment "to the extent that Zila requests declaratory relief from liability under the Agreement." The court explained that, "[s]ince the Agreement is unenforceable after the expiration of the patents on August 25, 1998, Zila cannot be forced to pay royalties after that date." Zila subsequently filed a further motion for summary judgment on its demand that Tinnell repay royalty payments from 1998 to 2000, arguing that the payments amounted to unjust enrichment. The district court denied summary judgment to Zila on this claim and, instead, dismissed it.

Tinnell did not sit idle after the district court's first order. He filed his own demand for entry of judgment, arguing that Zila owed him at least $56,753 in royalties for Canadian sales of Zilactin from August 2000, when he stopped receiving payments, until December 3, 2002, when the Canadian patent expired. Zila admitted to owing the money but claimed it was entitled to offset the amount against the American royalties it paid Tinnell from September 1998 through August 2000. The district court agreed with Zila's bottom line and went further: Tinnell had no rights to royalties in the United States *or* Canada, the district court held, because, although the 1980 Agreement "purports to require the payment of royalties based upon the Canadian patent, that agreement is unenforceable." The court noted that this result appeared inequitable but read *Brulotte* to require it.

On December 1, 2004 the parties stipulated to dismissal of Tinnell's outstanding counterclaim for breach of contact. The district court then declared all previous orders and the judgment ripe for appeal, and this timely appeal followed.

## II.

We first consider *Brulotte*. The case involved various patents held by the Thys Company, which sold farmers a hoppicking machine for a flat sum but required them to purchase a license for the patents on the machines in order to use the product. *Id.* at 29. The license contract demanded that, in addition to the initial purchase price of the machines and onerous restrictions on their assignment or use, the farmers pay the larger of a $500 annual royalty or a set royalty rate tied to the amount of hops they harvested each year. *Id.* The last patent incorporated into the machines expired in 1957. *Id.* at 30. When the farmers subsequently refused to pay the royalty, the Thys Company sued to enforce the licensing contract. *Id.*

The Supreme Court ruled for the farmers, holding that the royalty agreements were unenforceable to the extent that they extended "beyond the expiration date of the patent[s]." *Id.* at 32. The Court explained its holding in part by noting that

> [t]he present licenses draw no line between the term of the patent and the post-expiration period. The same provisions as respects both use and royalties are applicable to each. The contracts are, therefore, on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period.

*Id.* As a result, the Court "conclude[d] that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*," and held the farmer's royalty obligation under the license unenforceable. *Id.*

**[1]** Simply put, *Brulotte* indicates that under some circumstances patent owners cannot exact royalties for use of patented devices beyond the duration of their patents. *Id.* at 33-34. The doctrine appears straightforward enough, but its

application runs counter to the usual task in a contract case — to interpret the terms agreed to by the parties. That is, *Brulotte* renders unenforceable some aspects of an otherwise valid contract. And it does so for a reason that many courts and commentators have found economically unconvincing, namely, that "the free market visualized for the post-expiration period would be subject to monopoly influences" if "a royalty agreement [was allowed to] project[ ] beyond the expiration date of the patent."[4] *Id.* at 32-33. No matter how unconvincing *Brulotte*'s foundation may be, however, we are bound to apply its holding if it applies to the case before us. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("Court[s] of Appeals should follow the [Supreme Court] case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1018 (applying *Brulotte* despite stinging criticism of its logical underpinnings because "we have no authority to overrule a Supreme Court decision no matter how dubious its reasoning strikes us."). At the same time, our task is not to expand *Brulotte*'s holding beyond its terms. So,

---

[4]Reading *Brulotte* to create a bright line rule that always bars all royalties after a patent expires — no matter how clearly the underlying agreement states otherwise or covers non-patented intellectual property rights as well — courts and commentators have criticized roundly the fears that they believe led to that rule. The Seventh Circuit called them simply "not true," *Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1017 (7th Cir. 2002), and several commentators similarly suggest that they "lack . . . economic or logical sense," Note, Michael Koenig, *Patent Royalties Extending Beyond Expiration: An Illogical Ban from* Brulotte *to* Scheiber, 2003 Duke L. & Tech. R. 5, ¶ 19; *see also*, Harold See & Frank M. Caprio, *The Trouble with* Brulotte*: The Patent Royalty Term and Patent Monopoly Extension*, 1990 UTAH L. R. 813, 846 ("In no way . . . can the patent monopoly be extended beyond its term by the use of a royalty."); John W. Schlicher, 2 PATENT LAW, LEGAL AND ECONOMIC PRINCIPLES § 13:192 (2d ed.) ("The use of the longer royalty term does not permit the patent owner to turn a patent with a 20 year term into a patent with a 30 year term . . . . The market power existing during the term patent can only be exploited once."); Raymond T. Nimmer & Jeff Dodd, MODERN LICENSING LAW § 13:31 (noting that post-expiration royalties do not "expand the claims or the scope of the patent").

except as required by *Brulotte* and its progeny, we shall endeavor to give effect to the intent of the parties and the bargain that they struck.

**[2]** A central difference between this case and *Brulotte* is that here, although the contracting parties contemplated the possible future issuance of a patent, the royalty provision did not depend on it, either on its face or as reported by the contracting parties. Whether that difference is material is a difficult question that largely turns on the interpretation of a post-*Brulott*e Supreme Court case that had this same feature, *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979), and that enforced the contract's royalty provision.

**[3]** *Aronson* concerned an inventor who filed an application for a patent on a design for a keyholder. *Id.* at 259. While the patent application was pending, she negotiated a contract with a manufacturer to make and sell the product. *Id.* The agreement between the inventor, Aronson, and the manufacturer, Quick Point, consisted of two documents. *Id.* In the first, Quick Point agreed to pay a 5% royalty in return for an exclusive license to sell the invention described in the patent application; the duration of the royalty was not detailed. *Id.* In the second, the parties agreed that if the patent application "was not allowed" within five years, Quick Point would pay a 2.5% royalty so long as it sold the invention. *Id.* After five years passed and Aronson had failed to obtain a patent, Quick Point reduced its royalties to the lower rate, which it paid for 14 years. *Id.* at 260. As sales of the keyholder rose and competitors entered the market, Quick Point sought a declaratory judgment that the royalty agreement was unenforceable. *Id.* at 260-61. Although Quick Point persuaded the appeals court, the Supreme Court disagreed, holding that the *Brulotte* doctrine and similar federal patent principles "do not bear on a contract that does not rely on a patent, particularly where, as here, the contracting parties agreed expressly as to alternative obligations if no patent should issue." *Id.* at 262.

In so holding, the Court stated that enforcing the perpetual royalty of 2.5% was "consistent with the principles treated in *Brulotte*." *Id*. at 264. The distinction between the contract in *Brulotte* and the one in *Aronson* rested, according to the Court, on the fact that the extended royalty term in *Aronson* was not "negotiated 'with the leverage' of a patent [but] rested on the contingency that no patent would issue within five years." *Id*. at 265. The Court recognized that "a pending patent application gives the applicant some additional bargaining power for purposes of negotiating a royalty agreement," but observed that "the amount of leverage arising from a patent application depends on how likely the parties consider it to be that a valid patent will issue." *Id*. Because the parties in *Aronson* negotiated a two-tier royalty, with a contingency for the acceptance or rejection of the patent application, the court concluded that "[i]t is clear that whatever role the pending application played in the negotiation of the 5% royalty, it played no part in the contract to pay the [2.5%] royalty indefinitely." *Id*.

*Aronson* thereby added an additional wrinkle to the *Brulotte* analysis and has been read to create two bright-line rules: (1) If a patent ever issues on an invention, *Brulotte* applies, and no contract can properly demand royalty payments after the patent expires; and (2) a contract that provides for royalties either when a patent expires or when it fails to issue cannot be upheld unless it provides a discount from the alternative, patent-protected rate. *See Meehan v. PPG Industries, Inc.*, 802 F.2d 881, 884-85 (7th Cir. 1986); *Boggild v. Kenner Product*s, 776 F.2d 1315, 1319-20 (6th Cir. 1985); *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1372-74 (11th Cir. 1983). This understanding, however, may well overread both *Brulotte* and *Aronson*, by glossing over the unique and onerous contractual restrictions at issue in *Brulotte* and relying on a sentence in *Aronson* that is really only dicta.

*Brulotte* indicates that it is because of post-patent-expiration contractual restrictions *other* than royalties that the

Thys Company could not collect the royalties after the patents expired. Specifically, the Court in *Brulotte* noted that, although the farmers bought the hop-picking machines outright and title transferred, they were forced to obtain a license to actually use the machines; the licenses could not be assigned, making the machines the farmers purchased worthless for subsequent sales; the farmers were forbidden from moving their machines out of the *county*, whether or not they intended to use them elsewhere; and the license charged both a sliding royalty rate and a minimum fee, depending on use. 379 U.S. at 29.[5] It is only "in view of [these] *other* provisions of the license agreements" that the Court found the unchanging royalty rate to be "peculiarly significant." *Id*. at 31-32 (emphasis added). The Court emphasized that the presence of "*[t]hose* restrictions," rather than the royalty alone, in the "post-expiration period [was] a telltale sign that the licensor was using the licenses to project its monopoly beyond the patent period." *Id*. at 32 (emphasis added). In other words, the Thys Company was not simply attempting to charge a royalty after the patent expired; it was acting *in all respects* as if the patent remained in place. *See id*. ("The same provisions as respects *both* use and royalties are applicable [during the term of the patent and the post-expiration period] . . . . We are, *therefore*, unable to conjecture what the bargaining position of the parties might have been . . . .") (emphases added).

Moreover, *Brulotte* involved the sale of a physical machine along with a use license, where the machine was separately paid for and owned outright by the farmers. *Id*. at 29. As the Court noted, *id*. at 33 n.5, the sale of intellectual property alone, as here, is a considerably more complex matter than the contract at issue in *Brulotte*, and the concepts underlying *Brulotte* do not necessarily transfer to that context readily. An invention can have value to a manufacturer as a trade secret, or as an opportunity to exploit brand identified or market

---

[5]The dissent in *Brulotte* noted that the minimum fees, not dependent on use, were primarily at stake. *See* 379 U.S. at 34-39 (Harlan, J., dissenting).

share, quite aside from any patent that could issue on it. In *Brulotte*, in contrast, the farmers had no interest in the invention other than its physical embodiment — which they owned — and the right to use the intellectual property included in it, which could not be exploited by the patent holder once the patent expired.

*Aronson*, on the other hand, involved a sale of purely intellectual property to a manufacturer, and recognized the value of other intellectual property besides the patent. *See* 440 U.S. at 261-62 ("Quick Point apparently placed a significant value on exploiting the basic novelty of the device, even if no patent issued."); *id.* at 263 (noting that, even without patent rights, the contract allowed Quick Point "to preempt the market"); id. at 265 ("[Quick Point] agree[d] to pay for the opportunity to be first in the market"). This recognition was both necessary and sufficient to the holding in *Aronson* that *Brulotte* "does not bear on a contract that does not rely on a patent," as it was essential to the demonstration that the "[lower] royalty was explicitly independent of federal law." *Id.* at 261-2. Although the court stated in passing that, if Aronson had received a patent on her keyholder, "she would have received a 5% royalty only on keyholders sold during the 17-year life of the patent," this example was counterfactual dicta, neither supported by any analysis nor necessary for the decision.

In short, were we writing on a clean slate, we might be inclined to read the dicta in *Aronson* as nonbinding in light of what appears on its face to be a very limited holding in *Brulotte*. By doing so, we would largely avoid attributing to the Supreme Court in *Brulotte* and *Aronson* the lack of economic logic laid at its feet by *Scheiber* and a bevy of commentators.

[4] Nonetheless, every other circuit to consider *Brulotte* has ignored the relevance of the restrictions on use and, in the process, read *Aronson* as turning not on the absence of such restrictions or on the fact that the agreement was enacted before any patent issued but on the facts that (1) a patent did

*not* issue in that case; and (2) the underlying agreement provided for a lower royalty if no patent issued than if one did. *See Meehan* 802 F.2d at 884-85; *Boggild*, 776 F.2d at 1319-20; *Pitney Bowes*, 701 F.2d at 1372-73. This consensus view may overread both *Brulotte* and *Aronson* for the reasons we have surveyed, and gives rise to the trenchant criticisms of the commentators and of the Seventh Circuit in *Scheiber*. But the Supreme Court opinions are sufficiently opaque that we cannot say with any certainty that the consensus view is wrong. As patent matters give rise to particularly strong national uniformity concerns, *see* S. Rep. No. 97-275, at 4 (1982) (citing the "special need for national uniformity" in the interpretation of patent law as support for the creation of the Federal Circuit), we hesitate more than is ordinarily the case to open up an intra-circuit conflict, *see Hale v. Arizona*, 993 F.2d 1387, 1393 (9th Cir. 1993) (en banc) ("For prudential reasons, we avoid unnecessary conflicts with other circuits . . . ."). We therefore adopt the majority approach and consider not whether but the extent to which *Brulotte* preempts state law with regard to a contract for payment of royalties on the sale of an invention that may be patented, if a patent indeed issues on the invention.

## III.

Applying *Brulotte*, the district court in this case found that the 1980 Agreement was "unlawful per se under federal patent law." It therefore granted summary judgment "to the extent Zila requests declaratory relief from liability under the Agreement." In the subsequent order, however, the district court expanded its previous rulings. It interpreted *Brulotte* as rendering the *entire* patent assignment agreement null and void, not just its provision of royalties after 1998. Faced with the question whether Zila must pay Tinnell royalties it admitted were due under a valid Canadian patent, the district court determined that it need not, because, although the 1980 Agreement "purports to require the payment of royalties

based upon the Canadian patent, that agreement is unenforceable."

**[5]** Contrary to the district court's conclusions, *Brulotte* does not render an entire contract void and unenforceable merely because it includes an invalid licensing agreement. Rather, *Brulotte* renders unenforceable only that portion of a license agreement that demands royalty payments beyond the expiration of the patent for which the royalties are paid. *See* 379 U.S. at 30 (reversing the judgment below only "*insofar* as it allows royalties to be collected which accrued after the last of the patents . . . had expired") (emphasis added); *id.* at 33-34 (holding unenforceable "an attempt to project" the payment monopoly into a term "*after* the expiration of the last of the patents") (emphasis added). We previously referenced this interpretation of *Brulotte*'s scope in passing, *see Atlas-Pacific Eng'g Co. v. Geo. W. Ashlock Co.*, 339 F.2d 288, 289 n.1 (9th Cir. 1965), and it is not seriously in dispute. The parties agree, as has every appellate court to consider the question. *See, e.g.*, *Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1022 (7th Cir. 2002); *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1373 n.13 (11th Cir. 1983); *Modrey v. American Gage & Machine Co.*, 478 F.2d 470, 474 (2d Cir. 1973).

**[6]** The district court, however, read *Scheiber* to support its conclusion that *Brulotte* can render void contractual obligations to pay royalties on valid patents. In *Scheiber*, the plaintiff owned a U.S. patent and a Canadian patent. 293 F.3d at 1016. As part of a settlement agreement with the defendant, Scheiber agreed to receive royalties on both patents through the end of the Canadian patent's term, which ended two years after the U.S. patent. *Id.* The defendant, however, "refused to pay royalties on any patent after *it* expired." *Id.* at 1016 (emphasis added). The Seventh Circuit, applying *Brulotte*, found the contract unenforceable to the extent that the "patentee extends the patent beyond the term fixed in the [U.S.] patent statute." *Id.* at 1017; *see also id.* at 1022 (describing *Brulotte* as "refusing enforcement to contracts for the pay-

ment of patent royalties *after* expiration of the patent") (emphasis added). Accordingly, the relief granted by the court was not voiding the entire contract but rather a "*partial* rescission of the license agreement." *Id.* at 1021 (emphasis added). Although *Scheiber* states later in the opinion that the contract is "voided on grounds of illegality," *id.* at 1022, and "unenforceable," *id.* at 1023, the context provided by the previous lengthy discussion, as well as the limited relief sought, makes clear that this is true only of the portion of the contract "seeking to 'extend' [the] patent," *id.* at 1021, and not anything else. There is thus no support that for the notion that *Brulotte* erects a general barrier to the enforcement of otherwise valid contract terms unless and until that last applicable patent expires.

## A.   Unpaid Canadian Royalties

[7] Nor does *Brulotte* extend its royalty-cancelling powers to contracts for foreign patents. *Brulotte* concerned patent rights in the United States, 379 U.S. at 30 (citing 35 U.S.C. § 154, which grants rights "throughout the United States"), and reflected the Court's fear that a patent holder would abuse his federally-bestowed monopoly to extract payments beyond the term of *that* patent. 379 U.S. at 32-33. The "patent" at issue in *Brulotte* is an American one, and its dispositive effect on state contract law is a consequence of the Supremacy Clause. *See id.* at 32 ("[P]atents are in the federal domain."). "State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable; the states are free to regulate the use of such intellectual property in any manner not inconsistent with *federal* law." *Aronson*, 440 U.S. at 262 (emphasis added). The rights and obligations bestowed by the international patent regime played thus no role in *Brulotte*.

Nor should they. The Canadian patent is an entirely separate asset from the U.S. patent. *See* Paris Convention for the Protection of Industrial Property, July 14, 1967, Art. 4*bis*, 21

U.S.T. 1583, ("Patents applied for in the various countries of the Union . . . shall be independent of patents obtained for the same invention in other countries . . . ." ). The fact that the asset is a foreign patent, as opposed to foreign real estate or other real property held outside the country, does nothing to change the propriety and competency of state contract law to dispose of it. *Brulotte* has no self-executing international effect and only displaces state contract law with respect to royalty obligations related to federally-bestowed patent rights.

[8] In light of these observations, it is clear that summary judgment against Tinnell on his claim for the unpaid Canadian royalties was improper. Even if the principle announced in *Brulotte* were to obviate Zila's obligation to pay royalties on the 1981 patent once it expired, an issue we discuss below, it neither renders the entire 1980 Agreement unenforceable nor displaces Zila's obligation to pay royalties on the valid Canadian patent. Because Zila admitted in its statement of material undisputed facts that it owed $56,753 in royalties on the Canadian patent, there are no facts in dispute, and the district court should have entered judgment for Tinnell on this claim.[6]

## B.  Declaratory Judgments

Both Zila and Tinnell sought declaratory judgments in district court. Zila asked for a declaration that it is relieved of liability for any royalties under the 1980 Agreement; Tinnell desired a declaration that he is entitled to royalty payments in perpetuity. The district court granted summary judgment for Zila and correspondingly denied Tinnell's motion. Because Tinnell was entitled to at least some royalties under the 1980 Agreement, as we have established, the district court erred. The scope of royalties he is due on domestic sales is unclear,

---

[6]Whether royalties are payable for Canadian sales once the Canadian patent expires, a matter of Canadian law, is not before us.

however, so a remand to the district court is necessary to resolve disputed issues of fact.

The royalty provision in the 1980 Agreement does not reference any specific patent. Rather, it provides Tinnell with "a five percent (5%) royalty on gross sales . . . of the invention." This provision has no sunset clause, time limit, or territorial limitation. The only barrier to a perpetual royalty obligation that Zila has suggested is that which *Brulotte* provides.[7]

Determining the reach of *Brulotte*'s barrier to the collection of royalties requires us to consider the scope of the royalty provision, as well as the impact of subsequently-issued patents on the enforceability of the royalty provision. In other words, we have to ask both what Zila is paying royalties for and under what conditions its obligation to do so is lawful. We address each question in turn.

### 1. *The Royalty Provision*

Zila argues that the term "invention" in the royalty provision is explicitly defined in the agreement as limited to the claims described in and identified by the 1981 patent. Tinnell argues that the term refers, instead, to the product Zilactin, including the later, patented improvement.

Although the contract is ambiguous in some respects as to

---

[7]The record does not make clear whether the only sales of Zilactin outside the United States occurred in Canada and, if not, whether Zila is seeking to apply *Brulotte* to cut off royalties on any non-Canadian international sales as of the expiration of the American patents. We see no reason *Brulotte* would have any impact on the availability of royalties on foreign sales — because, once again, *Brulotte* derives only from federal Supremacy Clause principles and does not otherwise impair agreements to pay royalties in exchange for the assignment of an invention. But, in light of the ambiguity of the record and of the requests for declaratory relief, we leave any further consideration of the matter for the district court on remand.

the scope of the royalty provision, a remand is not necessary to resolve its meaning.[8] Even if we were to accept Zila's interpretation, we do not read *Brulotte* so mechanically as to render the royalty provision here necessarily invalid as of the expiration of the 1981 patent. Rather, we believe the parties' intent can be best furthered, and the *Brulotte* doctrine implemented, by a more nuanced consideration of the contract.

**[9]** If the 1980 Agreement had provided royalties *only* on the 1981 patent, those royalties could not be enforced after 1998. But the contract did no such thing; it provided royalties on "sales . . . of the *invention*." (Emphasis added). Even if we accept that this clause covers only sales of the original three acid compound, the parties agree that the invention is embodied in and essential to Zilactin and, thus, sales of Zilactin constitute sales of the invention.

The invention has been improved, however, and Zila argues that the contract does not entitle Tinnell to royalties on sales of Zilactin in its improved form. This argument is unpersuasive.

Consider a hypothetical: Henry Ford applies for a patent on an inventive transport vehicle, which he calls a "car." The "car" has four wheels and uses a motor to propel people from place to place. Ford subsequently signs a contract assigning to the Motor Company his rights to the car, any patent that might issue on it, as well as any future improvements on the car that he may make. Every few years, Ford improves the car, adding a roof, for example, and doors. He receives patents on these improvements, and the Motor Company incorporates them into the car. Even with these improvements, however, the product that the Motor Company sells is nonetheless a "car," as defined in the original patent application, because it remains a vehicle with four wheels and a motor.

---

[8]Zila does not argue that "invention" means the 1981 patent itself. Rather, it contends that "invention" refers to the three acid compound described in the patent application.

**[10]** Here, as in the hypothetical, the improvements to the three acid compound do not change the fact that the resulting product fits the definition of the original invention — "[a] composition for the topical treatment of herpes virus lesions comprise[d] of effective amounts of tannic acid, boric acid and salicylic acid in a liquid carrier." We therefore need not consider whether Zila's interpretation of the royalty provision is correct.

### 2.   1992 Patent

The more pertinent question is whether the bundle of patents covered by the 1980 Agreement can be distinguished from the patents in *Brulotte*. *Brulotte* explicitly held that royalties on a product are unenforceable only "after the *last* of the patents incorporated into the machines . . . expire[s]." 379 U.S. at 30 (emphasis added). Here, as in *Brulotte*, the contract at issue covers a bundle of patents that expire at different times. *See id.* at 29-30. Unlike *Brulotte*, however, the 1980 Agreement references only prospective patents with indeterminate expiration dates.[9] In other words, although the contracts in *Brulotte* covered patents that expired at different times, the expiration date for the last-expiring patent was known at the time of the contract in *Brulotte*. In contrast, neither party to the 1980 Agreement knew at the time the agreement was signed which or how many patents it would cover and, consequently, when the last of those patents would expire.

**[11]** We see no reason to treat the two cases differently. Although the subsequent improvements to Tinnell's invention were contingent at the time of the contract, they were contemplated by the parties. The 1980 Agreement alluded to "improvements thereon and Letters Patent thereon . . . including

---

[9]At the time the parties signed the contract, the 1981 patent had not issued, nor had applications been filed on the '236 continuation patent, the Canadian patent, or the 1992 improvement patent.

any present or future improvement . . . whether presently existing or made in the future . . . ." Over the next twelve years, as patents issued, both parties operated with the understanding that the 1980 Agreement governed their relationship. The patents that issued after the 1980 Agreement was signed were thus part of the bundle of intellectual property rights that the parties contracted for in the first instance. *See Meehan*, 802 F.2d at 884-86; *Boggild*, 776 F.2d at 1320-21.

*Brulotte* poses no bar to the collection of royalties so long as Zilactin incorporates a valid patent for a compound invented by Tinnell pursuant to the 1980 Agreement. When an inventor is listed on an application for a patent, and a patent issues, he has — unless he has assigned it to someone else — the right to exploit the federal patent monopoly, "empower[ing him] to exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte*, 379 U.S. at 33; *see Meehan*, 802 F.2d at 885. Although Tinnell assigned the patent to Zila before it issued, and thus held no patent rights the 1992 patent issued, "it is the issuance of the patent that triggers *Brulotte*'s application, not the transfer of the rights." *Meehan*, 802 F.2d at 885. And because *Brulotte* prohibits only "a projection of the patent monopoly after the patent expires," 379 U.S. at 32, Tinnell can receive payment on his inventions from Zila, the party to whom he has assigned the patent rights and who is therefore the patent owner, so long as that monopoly is valid. Whether this monopoly consists of one patent or a dozen, the ability to exact royalties runs to the last of the patents providing monopoly protection. *Id.* at 30.

**[12]** Consequently, if Tinnell invented an improvement on his 1981 patent, which was itself patented and provided additional monopoly protection, *Brulotte* cannot be applied to displace the royalty provision when the 1981 patent expires. Instead, the royalty obligation would stand until the end of the term of any such later patent.

Here, there is a disputed issue of fact as to whether Tinnell did so, specifically whether he or Edwin Pomerantz invented the improvement embodied in the 1992 patent. Despite the fact that the patent listed Pomerantz as the inventor, Tinnell produced extensive evidence that the idea originated with him: Zila named him as the inventor on the first application; Pomerantz told Zila's patent counsel that Tinnell first had the idea; another witnesses so testified; and Zila's patent counsel told Tinnell that he would be named the inventor.

[13] We therefore remand to the district court for a determination whether Tinnell should be credited with invention of the 1992 patent.[10] If he should be, summary judgment in his favor is appropriate to the extent that it declares him entitled to domestic royalties until the 1992 patent expires. If not, summary judgment in Zila's favor is appropriate to the extent that it declares the company released from liability for any domestic royalties after the 1981 patent expired in 1998.[11]

**REVERSED** and **REMANDED** for proceedings consistent with this opinion.

---

[10]Section 256 of the Patent Act permits a court to correct the name of an inventor on an issued patent when "through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part."

[11]We do not address Zila's unjust enrichment claim, as it may never arise on the view we take of the case. If Zila is found on remand to owe Tinnell royalties on American sales of Zilactin through 2009, its earlier payments would be consistent with that obligation, and no unjust enrichment issue could arise.