**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C.R. BARD, INC.,

        *Plaintiff-Appellant*,

  v.

ATRIUM MEDICAL
CORPORATION,

        *Defendant-Appellee*.

No. 23-16020

D.C. No. 2:21-cv-
00284-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted July 9, 2024
San Francisco, California

Filed August 23, 2024

Before: Michelle T. Friedland, Salvador Mendoza, Jr., and
Roopali H. Desai, Circuit Judges.

Per Curiam Opinion

# SUMMARY[*]

## Patent Law

The panel reversed the district court's judgment following a bench trial in favor of Atrium Medical Corporation on C.R. Bard, Inc.'s claim that Atrium breached its contract with Bard by failing to make certain minimum royalty payments due under a licensing agreement.

In *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), the Supreme Court held that patent holders may not contract for royalties on any use of a patented invention that occurs after the patent has expired. Clarifying the proper application of *Brulotte*, the panel held that a court must first use state law tools of contract interpretation to determine the parties' contractual obligations. Then, the court must separately ask whether those contractual obligations are permissible under *Brulotte*. To do so, the court asks only whether the contract provides for royalties on the use of a patented invention that occurs after the expiration of the patent.

Applying *Brulotte* to the parties' agreement, the panel held that the district court erred in concluding that a portion of the parties' agreement violated *Brulotte* in light of the subjective motivations of the parties during the course of their negotiations. The parties' agreement provides for U.S. royalties only through the expiration of the U.S. patent, so it does not constitute patent misuse under *Brulotte*. Accordingly, the panel reversed the district court's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

entry of judgment for Atrium on Bard's breach of contract claim.

The panel addressed the remaining issues in a concurrently filed memorandum disposition.

---

**COUNSEL**

Brian R. Matsui (argued), Seth W. Lloyd, and Deanne E. Maynard, Morrison & Foerster LLP, Washington, D.C.; Diana L. Kim, Morrison & Foerster LLP, Palo Alto, California; Andrew Federhar and Jessica Gale, Spencer Fane LLP, Phoenix, Arizona; Steven C. Cherny, Quinn Emanuel Urquhart & Sullivan LLP, Boston, Massachusetts; Matthew A. Traupman, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; for Plaintiff-Appellant.

Christopher McArdle (argued), Wade G. Perrin, and Paul Tanck, Alston & Bird LLP, New York, New York; Charles W. Cox II, Alston & Bird LLP, Los Angeles, California; for Defendant-Appellee.

---

**OPINION**

PER CURIAM:

Under the Supreme Court's decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), patent holders may not contract for royalties on any use of a patented invention that occurs after the patent has expired. The Court has declined to overrule *Brulotte*, explaining that the "decision is simplicity itself to apply" and that parties may "find ways around" its

prohibition. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 453, 459 (2015).

We now clarify the proper application of *Brulotte*. A court must first use the familiar state law tools of contract interpretation to determine the parties' contractual obligations. Factfinding may be required to determine the meaning of any ambiguous terms. Then, the court must separately ask whether those contractual obligations are permissible under *Brulotte*. To do so, the court asks only whether the contract provides for royalties on the use of a patented invention that occurs after the expiration of that patent. That question of law is a formal inquiry that does not depend on the parties' motivations, the course of their negotiations, or the consideration received by either party in exchange for the inclusion of a particular contractual term.

Here, the district court concluded that a portion of a licensing agreement violated *Brulotte* in light of the subjective motivations of the parties during the course of their negotiations. We conclude that the agreement at issue does not provide for royalties on post-expiration use of a patented invention, so we reverse.[1]

## I.

C.R. Bard, Inc. ("Bard"), is a medical device company. Through a subsidiary, it held two patents on a type of vascular graft: one U.S. patent and one Canadian patent. Bard sued Atrium Medical Corporation ("Atrium") for patent infringement, and the two companies settled the suit in 2011 by entering into a licensing agreement. The terms of the agreement provided that Atrium would pay Bard a

---

[1] We address the other issues presented by this appeal in a concurrently filed memorandum disposition.

15% per-unit royalty on covered U.S. sales until the U.S. patent expired in 2019 and a 15% per-unit royalty on covered Canadian sales until the Canadian patent expired in 2024. The agreement also provided that "in no event will royalties for any calendar quarter of the Term[2] be less than" $3.75 million (equivalent to $15 million per year).

Sales of Atrium's "iCast" stent, which occurred only in the United States, were not initially subject to the per-unit royalties. The Food and Drug Administration ("FDA") had approved the iCast stent only for use in a patient's airway. But nearly all iCast sales were for off-label vascular uses. When the parties entered the license agreement, Atrium was preparing to seek FDA approval for vascular iCast uses, which it predicted would dramatically increase sales. The parties' agreement provided that, once such FDA approval was granted, the iCast stent would become subject to the 15% per-unit royalty, and the minimum royalty payments would terminate. The agreement also provided that the minimum royalty payments would terminate if the FDA were to "rescind[] its approval to market or sell" the iCast stent "for any and all indications previously approved."

Contrary to the parties' expectations, the FDA did not grant approval for vascular iCast uses until 2023, well after the U.S. patent expired in 2019. Because the per-unit royalties never exceeded the quarterly minimum royalty payments, Atrium only ever paid the minimum due under the agreement. Atrium stopped making the minimum royalty payments to Bard when the U.S. patent expired. Atrium

---

[2] The definition of "Term" stated: "This Agreement shall be effective as of the Effective Date and shall remain in full force and effect until the last to expire of all the patents included within the Licensed Patents, unless earlier terminated in accordance with its terms."

then paid only the per-unit royalties on Canadian sales, which were substantially smaller than the minimum royalties, for about two years. As the parties' dispute over the payments unfolded, Atrium ceased paying those per-unit royalties as well.

Bard sued Atrium in 2021. It alleged, as relevant here, that Atrium's failure to make the minimum royalty payments between the expiration of the U.S. patent in 2019 and the FDA's approval of iCast for vascular use in 2023 was a breach of contract. After discovery, the parties filed cross-motions for summary judgment. Atrium asserted that the minimum royalty provision was unenforceable after the expiration of the U.S. patent because it constituted patent misuse under *Brulotte*. The district court concluded that there was a factual dispute as to "the extent to which minimum royalties after August 2019 include[d] payments for use of the [U.S.] patent," precluding summary judgment on Bard's breach-of-contract claim.

The district court held a two-day bench trial. Five witnesses testified, largely about the negotiations between Bard and Atrium that led to their licensing agreement. The district court then issued findings of fact and conclusions of law. The district court found that the "clear and primary purpose of the minimum royalty provision was to compensate Bard for iCast sales" in the United States. In light of that purpose, the district court held that the minimum royalty provision constituted patent misuse after the expiration of the U.S. patent.

Bard timely appealed.

## II.

The district court exercised jurisdiction under 28 U.S.C. § 1332.  We have appellate jurisdiction under 28 U.S.C. § 1291.**³**

We review de novo a district court's legal conclusions. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1061 (9th Cir. 2015).

## III.

We conclude that the minimum royalty provision does not constitute patent misuse under *Brulotte*.  We first explain the controlling precedents.  We then explain why application of the *Brulotte* rule is a question of law that we review de novo.  Finally, we apply *Brulotte* to the parties' agreement.

## A.

The Constitution empowers Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8.  The Patent Act specifies the period after which a patent expires.  35 U.S.C. § 154(a)(2).

In *Brulotte*, the Supreme Court held that patent holders may not contract for royalties on the use of a patented invention that occurs after the patent has expired.  379 U.S.

---

[3] The claims at issue in this case arise under state law, not federal patent law, so appellate jurisdiction does not lie with the Federal Circuit. *See* 28 U.S.C. § 1295(a)(1) (providing for exclusive Federal Circuit jurisdiction over appeals in "any civil action arising under . . . any Act of Congress relating to patents").  Atrium's patent-misuse defense does not affect the jurisdictional analysis. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (describing the well-pleaded complaint rule).

at 32.  There, purchasers had each acquired a hop-picking machine in exchange for both a "flat sum" and a seasonal "license for its use." *Id.* at 29.  The seasonal license payment was calculated as the greater of either "a minimum royalty of $500 for each hop-picking season or $3.33 1/3 per 200 pounds of dried hops harvested by the machine." *Id.*  The licenses referred to twelve patents, seven of which "were incorporated into the machines." *Id.* at 30.  "Of those seven all expired on or before 1957.  But the licenses . . . continued for terms beyond that date." *Id.*  The purchasers "refused to make royalty payments accruing . . . after the expiration of the patents." *Id.*

The Supreme Court held that "any attempted reservation or continuation in the patentee . . . after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Id.* at 31 (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)).  The agreement was therefore invalid "insofar as it allow[ed] royalties to be collected which accrued after the last of the patents incorporated into the machines had expired." *Id.*  The Court reasoned that "there is intrinsic evidence that the agreements were not designed" merely to "spread the payments for the use of the patent" over "a reasonable amount of time." *Id.* at 31 (quotation marks omitted).  The Court explained that, because the licenses drew "no line between the term of the patent and the post-expiration period," the "contracts [were] . . . on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired" as for the period before the patents expired. *Id.* at 32.

The Court revisited the *Brulotte* rule in *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015).  Acknowledging a "broad scholarly consensus" against the economic

assumptions made in *Brulotte*, *id.* at 461 (citing judicial and academic criticism), the Court nevertheless concluded that overruling *Brulotte* was not justified as a matter of *stare decisis*, *id.* at 465. The Court in *Kimble* explained in part that *Brulotte* "is simplicity itself to apply": "A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 459.

The Court in *Kimble* also emphasized the limits of the *Brulotte* rule, noting that "parties can often find ways around *Brulotte*." *Id.* at 453. Parties may, for example, "defer payments for pre-expiration use of a patent into the post-expiration period," because "all the decision bars are royalties for using an invention after it has moved into the public domain." *Id.* at 453–54. For instance, parties may agree to royalties "equal to 10% of sales during the 20-year patent term," paid over 40 years. *Id.* at 454. "[P]arties have still more options when a licensing agreement covers either multiple patents or additional non-patent rights. Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires." *Id.* And parties may agree to continuing royalties on non-patent rights that are "closely related to a patent," such as "a license involving both a patent and a trade secret" that sets "a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." *Id.*

We have applied *Brulotte* in two published opinions.[4]

---

[4] We cited *Brulotte* in an additional opinion, issued mere weeks after *Brulotte* was decided, but we simply noted that it was not applicable. *Atlas-Pac. Eng'g Co. v. Geo. W. Ashlock Co.*, 339 F.2d 288, 289 n.1 (9th Cir. 1964).

The first decision, *Zila, Inc. v. Tinnell*, 502 F.3d 1014 (9th Cir. 2007), concerned a licensing agreement for a herpes treatment.   After applying for a patent, an inventor transferred his intellectual property to Zila in exchange for stock and a 5% perpetual royalty.  *Id.* at 1017.  Zila then secured several U.S. patents and one Canadian patent.  *Id.* Zila ultimately stopped paying royalties to the inventor, invoking the *Brulotte* rule.  *Id.* at 1018.

We noted the "unconvincing" economic basis of *Brulotte* and stated that "our task is not to expand *Brulotte*'s holding." *Id.* at 1019–20.  We first held that *Brulotte* had no effect on Zila's obligation to pay royalties for use of the Canadian patent because *Brulotte* does not "extend its royalty-canceling powers to contracts for foreign patents."  *Id.* at 1023.  We then held that *Brulotte* prohibited U.S. royalties after the expiration of the final U.S. patent, and we remanded for the district court to resolve a factual dispute related to whether the final U.S. patent had already expired.  *Id.* at 1025–27.

We again applied *Brulotte* in *Kimble v. Marvel Enterprises Inc.*, 727 F.3d 856 (9th Cir. 2013), *aff'd sub nom. Kimble*, 576 U.S. at 465.[5]  We considered a licensing agreement for a toy that allowed a user to "mimic[] Spider-Man's web-shooting abilities with foam string."  *Id.* at 857–

---

[5] In reviewing our court's judgment in *Kimble*, the Supreme Court considered only whether to overrule *Brulotte*.  576 U.S. at 449.  The Supreme Court declined to do so and therefore affirmed our court's judgment.  *Id.* at 465.  Our opinion in *Kimble* remains binding circuit precedent because the judgment was left undisturbed and because the Supreme Court's decision was in no way irreconcilable with our analysis.  *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that circuit precedent remains binding unless it is "clearly irreconcilable" with an intervening Supreme Court decision).

58. Kimble, the patent-holder, settled an infringement and breach of contract lawsuit with Marvel, which had been selling a "Web Blaster." *Id.* at 858. The terms of the settlement agreement provided that Marvel would purchase the patent from Kimble in exchange for a lump sum and an ongoing royalty of 3% on both "product sales that would infringe the Patent . . . as well as sales of the Web Blaster product." *Id.* at 858–59.

We stated that, under *Brulotte*, royalties on sales of a product that embodies both a patented invention and a non-patent right (such as a trade secret) must "provide[] a discount for the non-patent rights from the patent-protected rate" after the patent expires. *Id.* at 863. "This is because—in the absence of a discount or other clear indication that the license was in no way subject to patent leverage—we presume that the post-expiration royalty payments are for the then-current patent use, which is an improper extension of the patent monopoly under *Brulotte*." *Id.* at 863–64.

We concluded that the agreement's post-expiration royalties were barred by *Brulotte*. We noted that the 3% royalty did not decrease upon expiration of the patent and applied to "both patent and Web Blaster rights, with no discount or other clear indication that the Web Blaster royalties were not subject to patent leverage." *Id.* at 864. We rejected the idea that there were two separate royalties, one for patent rights and one for the Web Blaster product, explaining that the parties' agreement referred both to patent rights and to the Web Blaster product only because litigation over whether the product actually infringed the patent was ongoing at the time of the settlement. *Id.* We concluded that "the rights were intertwined and [could not] be separated in any principled manner." *Id.* We therefore rejected the argument that the case fell outside *Brulotte* because it

concerned a "'hybrid' *agreement*, that coincidentally included both patent and non-patent rights, as opposed to a 'hybrid' *product*, consisting of both patented and non-patented ideas." *Id.* at 865. We noted that "a discounted [post-expiration] rate may not be necessary to avoid *Brulotte* in every case," but we held that "in the absence of a discounted rate, there must be some other clear indication" that the royalty was not for use of the patent after its expiration. *Id.*

**B.**

In this case, the district court made factual findings about why the parties included the minimum royalty provision in their licensing agreement. Those factual findings do not control our review, however, because the application of the *Brulotte* rule is a question of law that depends on the terms of the contract at issue. The *Brulotte* inquiry does not turn on the parties' motivations, the course of their negotiations, or the consideration received by either party in exchange for the inclusion of a particular contractual term. Of course, what the parties' obligations are when a contractual provision is ambiguous can be a factual question that turns on what the parties intended the contract to require. But once a factfinder has answered that question, whether the contract's requirements constitute patent misuse under *Brulotte* is a question of law. Here, there is no dispute about what the parties' licensing agreement requires. There is only a dispute about whether those requirements constitute patent misuse under *Brulotte*. We review that question of law de novo.

Our conclusion that the *Brulotte* inquiry is a question of law is consistent with every controlling precedent. In *Brulotte* itself, the Supreme Court analyzed the "provisions

of the license agreements" at issue and held that the terms were improper "on their face." 379 U.S. at 31–32. The Court did not inquire into the parties' negotiations. Consistent with that analysis, the Court later explained that "[a] court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent." *Kimble*, 576 U.S. at 459.

We have likewise treated the application of *Brulotte* as a question of law turning on the terms of a licensing agreement. In *Zila*, we applied *Brulotte* based on the terms of the contract at issue. 502 F.3d at 1022–27. We did so again in the *Kimble* decision that was reviewed by the Supreme Court. *See* 727 F.3d at 864–66. To be sure, in *Kimble* we noted a few extrinsic facts to provide context for our analysis. For example, we noted that "[a]t the time the parties negotiated the agreement, the patent infringement claim was not definitively resolved." *Id.* at 864. We used that fact to determine that the parties' agreement was not referring to two distinct rights when it referred to patent rights and rights to the "Web Blaster" product. *Id.* But our *Brulotte* analysis turned on the requirements actually imposed by the agreement, not the back-and-forth of the negotiations through which the parties agreed to those terms. *See id.* at 864–66 (observing that the parties' agreement provided for post-expiration royalties and lacked "any clear indication that the Web Blaster royalties were not subject to patent leverage").

Other circuits likewise apply the *Brulotte* rule by looking at the terms of the agreement at issue. *See, e.g.*, *Meehan v. PPG Indus., Inc.*, 802 F.2d 881, 886 (7th Cir. 1986) ("The terms of the contract must be examined."); *Boggild v. Kenner Prods.*, 853 F.2d 465, 469 (6th Cir. 1988) (declining to remand for an inquiry into the parties' bargaining

history);[6] *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1373 (11th Cir. 1983) (concluding that an agreement violated *Brulotte* because of "two provisions in the agreement"). We know of no published decision by any Court of Appeals that treats the application of *Brulotte* as a factual question turning on the parties' motivations during negotiations.

Treating the application of *Brulotte* as a factual inquiry into the parties' motivations would run afoul of the Supreme Court's statement that parties may "find ways around *Brulotte*." *Kimble*, 576 U.S. at 453. Parties seeking to find a way around *Brulotte* may evince motivations that are in some sense contrary to *Brulotte*, even if the unambiguous terms of the agreement themselves are permissible. Indeed, as this case illustrates, the parties themselves often cannot cleanly or consistently identify their motivations for entering into an agreement, and each party may value a given provision differently. By contrast, looking only at the terms of the agreement is consistent with both the Supreme Court's statement that *Brulotte* is "simplicity itself to apply," *id.* at 459, and our statement that "our task is not to expand *Brulotte*'s holding beyond its terms," *Zila*, 502 F.3d at 1020.

## C.

Having concluded that the *Brulotte* rule is a question of law that we review de novo, we now turn to its application in this case. We "need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Kimble*, 576 U.S. at 459. We emphasize that the parties do not dispute what

---

[6] One concurring judge explained *Boggild* as holding that the application of *Brulotte* depends on "the terms of the license and that other evidence of the motivation of the parties with respect to leverage is irrelevant." *Boggild*, 853 F.2d at 470 (Brown, J., concurring).

the terms of their contract require—only whether those requirements are permissible under *Brulotte*.

The licensing agreement terms unambiguously require a 15% per-unit royalty on U.S. sales until the expiration of the U.S. patent and a 15% per-unit royalty on Canadian sales until the expiration of the Canadian patent, which does not violate *Brulotte*. The agreement states that Atrium will pay "a royalty of fifteen percent (15%) of the Net Sales of all Licensed Products sold during the Term." "Licensed Products" refers to covered products "that are made, used, offered for sale and/or imported or sold in a country where one or more claims of the Licensed Patents are issued and outstanding." And "Licensed Patents" refers to Bard's U.S. patent, as well as "all other patents . . . issued anywhere in the world that rely on the [U.S.] patent for priority." The "Licensed Patents," then, encompass the U.S. and Canadian patents. The per-unit royalty provision plainly complies with *Brulotte* because it simply provides royalties on each respective patent only until that patent expires.

Next, the minimum royalty provision establishes a minimum amount due for the use of all unexpired patents in their respective countries. The minimum royalty provision states "in no event will royalties for any calendar quarter of the Term be less than" $3.75 million ($15 million per year). The agreement provides that the minimum royalty provision would terminate only if the FDA approved iCast for vascular use or rescinded approval for any use. Otherwise, the agreement—and thus the minimum royalty provision—was to remain in effect "until the last to expire of all of the patents included within the Licensed Patents." The last "Licensed Patent" to expire was the Canadian patent in 2024. Thus, absent another condition triggering the end of the minimum payment provision, Atrium was required to pay Bard at least

$3.75 million per quarter until the expiration of the Canadian patent.

We conclude that the minimum royalty provision also complies with *Brulotte*. After the expiration of the U.S. patent, the agreement provides for minimum royalties only on Canadian sales, not U.S. sales. The provision therefore does not provide for royalties on "post-expiration use" of the U.S. patent. From 2011 to August 2019, the minimum royalty provision applied to use of both the U.S. patent in the United States and the Canadian patent in Canada. Beginning in August 2019, when the U.S. patent expired, the minimum royalties applied only to use of the Canadian patent in Canada. Atrium was obligated to pay a 15% royalty, and no less than $3.75 million per quarter, on its covered Canadian sales. Atrium's post-expiration U.S. sales were completely irrelevant. Even if they had increased a thousand-fold, it would not have affected the payments Atrium owed to Bard. The agreement therefore does not "provide[] royalties for post-expiration use" of the U.S. patent. *Kimble*, 576 U.S. at 459. *Brulotte* concerns only whether royalties are "by their terms for use during" the post-expiration period. 379 U.S. at 31. It does not prohibit royalties that are, by their terms, royalties for something other than use of the expired U.S. patent.[7]

Atrium argues that the presence of U.S.-focused conditions in the licensing agreement demonstrates that the minimum royalties are royalties on U.S. sales. The agreement contains two termination triggers for the minimum royalties, providing that they shall cease if the

---

[7] We note that, even absent ongoing post-expiration sales in another country, parties may contract for flat post-expiration payments that are not a royalty for ongoing use. *See Kimble*, 576 U.S. at 453–54.

FDA grants approval for vascular use of the iCast stent or if the FDA rescinds all previously approved iCast uses.

Although those provisions certainly concern the U.S. market, they do not affect the character of the royalties provided for in the agreement. The fact that Atrium sells the iCast stent only in the United States is wholly within Atrium's control. Had Atrium started selling it in Canada, Atrium would have had to pay per-unit royalties for those sales under the Canadian patent once the FDA approved it for vascular use. And although the FDA is a U.S. regulator, conditioning payments on possible FDA actions simply serves to allocate risk between the parties. The minimum royalty payments incentivized Atrium to seek prompt FDA approval of vascular iCast uses, from which Bard stood to benefit. On the other hand, had the FDA rescinded "its approval to market or sell" iCast for "any and all" uses, such an unexpected and drastic event would no doubt have had significant consequences for Atrium's finances, so that provision guarded against a disastrous outcome for Atrium. Neither of those provisions dictates whether the minimum royalties are royalties on U.S. sales.

Atrium also implies that the minimum royalty payments at issue are not Canadian royalties—and are therefore prohibited U.S. royalties—because they are far greater than the 15% per-unit royalty on Atrium's Canadian sales. We reject that argument. A minimum royalty provision has effect only if it may require payments greater than the per-unit royalty. And *Brulotte* establishes a per se rule, so we have no occasion to decide whether the size of a royalty is reasonable. *See Kimble*, 576 U.S. at 459 (declining to replace *Brulotte*'s per se rule with a reasonableness analysis). Whether $3.75 million per quarter is a reasonable

royalty for Atrium's Canadian sales does not affect whether such payments *are* Canadian royalties.

Finally, Atrium suggests that the minimum royalty provision violates *Brulotte* because the amount of the minimum royalties is not discounted upon expiration of the U.S. patent. We disagree. That argument stems from the rule concerning post-expiration royalties on U.S. sales of products that implicate both a patent and a non-patent right. If such post-expiration royalties reflect a discount compared to the pre-expiration royalties, that discount indicates that the portion of the royalty attributable to the patent right has properly ended upon the patent's expiration. That rule is not applicable here because the royalties at issue are not royalties on sales reflecting "inseparable patent and non-patent rights." *Kimble*, 727 F.3d at 857.

The parties' agreement provides for U.S. royalties only through the expiration of the U.S. patent, so it does not constitute patent misuse under *Brulotte*.

## IV.

For the foregoing reasons, we reverse the district court's entry of judgment for Atrium on Bard's breach of contract claim.