**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STEPHEN KIMBLE; ROBERT MICHAEL GRABB, individuals, *Plaintiffs-Appellants*, <br><br> v. <br><br> MARVEL ENTERPRISES INC., *Defendant-Appellee*. | No. 11-15605 <br><br> D.C. No. 4:08-cv-00372-DCB <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
December 5, 2012—San Francisco, California
Submission vacated December 14, 2012
Resubmitted May 29, 2013

Filed July 16, 2013

Before: Diarmuid F. O'Scannlain, Sidney R. Thomas,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY[*]

### Patent Rights

The panel affirmed the district court's summary judgment in favor of Marvel Enterprises, Inc., holding that royalties had to end when the patent expired for the Web Blaster, a Spider-Man toy.

The panel held that under *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), a so-called "hybrid" licensing agreement encompassing inseparable patent and non-patent rights is unenforceable beyond the expiration date of the underlying patent, unless the agreement provides a discounted rate for the non-patent rights or some other clear indication that the royalty at issue was in no way subject to patent leverage.

### COUNSEL

Antonio R. Durando (argued), Tucson, Arizona; Stephen Kimble, Tucson, Arizona; and Robert Grabb, Tucson, Arizona, for Plaintiffs-Appellants.

David Fleischer (argued), Haynes and Boone, LLP, New York, New York; Andrew M. Jacobs, Snell & Wilmer L.L.P., Tucson, Arizona; and Jason T. Christiansen, Zuniga Christiansen PLLC, Houston, Texas, for Defendant-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

CALLAHAN, Circuit Judge:

This appeal calls on us to again construe the Supreme Court's frequently-criticized decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964). In *Brulotte*, the Court held that a patent licensing agreement requiring a licensee to make royalty payments beyond the expiration date of the underlying patent was unenforceable because it represented an improper attempt to extend the patent monopoly. *Id.* at 30–33. We have previously noted that *Brulotte* has been read to require that any contract requiring royalty payments for an invention either after a patent expires or when it fails to issue cannot be upheld unless the contract provides a discount from the alternative, patent-protected rate. *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1021 (9th Cir. 2007). We acknowledged that the *Brulotte* rule is counterintuitive and its rationale is arguably unconvincing. *Id.* at 1019–20 & n.4. Nonetheless, recognizing that we are bound by Supreme Court authority and the strong interest in maintaining national uniformity on patent law issues, we have reluctantly applied the rule. *Id.* at 1020, 1022. We are compelled to do so again. Accordingly, we join our sister circuits in holding that a so-called "hybrid" licensing agreement encompassing inseparable patent and non-patent rights is unenforceable beyond the expiration date of the underlying patent, unless the agreement provides a discounted rate for the non-patent rights or some other clear indication that the royalty at issue was in no way subject to patent leverage. *See Meehan v. PPG Indus., Inc.*, 802 F.2d 881, 884–86 (7th Cir. 1986); *Boggild v. Kenner Prods.*, 776 F.2d 1315, 1319–20 & n.5 (6th Cir. 1985); *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1371–72 (11th Cir. 1983).

# I

## A

Around 1990, Appellant Stephen Kimble[1] invented a Spider-Man toy that allowed a child or other user to "role play" as Spider-Man by mimicking Spider-Man's web-shooting abilities with foam string.  A user would operate the toy by activating a trigger attached to a valve in the palm of a glove.  The valve was attached to a flexible line leading to a can of foam strapped to the user's wrist or waist.  Kimble patented the idea under U.S. Patent No. 5,072,856 (the "'856 Patent").  The '856 Patent expired on or about May 25, 2010.

In December 1990, Kimble met with Lou Schwartz (the President of Appellee Marvel's predecessor[2]) to discuss the idea covered by then-pending application for the '856 Patent and other "ideas and know-how."  Kimble contends that at the meeting, Schwartz verbally agreed that Marvel would compensate him if it used any of his ideas.  Marvel subsequently told Kimble that it was not interested in his ideas.  Despite its supposed lack of interest, Marvel thereafter began manufacturing a similar Spider-Man role-playing toy

---

[1] Kimble is the inventor of the intellectual property at issue, while Appellant Robert Grabb represented Kimble in a prior litigation with Marvel and, at some point, acquired an interest in the property. Accordingly, as most of the references concern Kimble alone, we use "Kimble" in the singular to refer to both Appellants for ease of reference.

[2] Marvel Entertainment, LLC is the entity actively litigating the action, and is the successor to Marvel Enterprises, Inc. (the named party), and Toy Biz, Inc. (the entity that Kimble allegedly shared his ideas with and defendant in the 1997 action).  We refer to all of these entities as "Marvel."

called the "Web Blaster." The Web Blaster allowed that toy's user to shoot foam string from a can mounted on the user's wrist by activating a trigger in the user's hand. Like Kimble's toy, the Web Blaster was packaged with a glove, but unlike Kimble's toy, the Web Blaster glove was purely cosmetic – a Web Blaster user did not need the glove in order to shoot foam string.

**B**

In 1997, Kimble sued Marvel for patent infringement and breach of contract, claiming that it had used his ideas in developing the Web Blaster without compensating him. Kimble alleged that Marvel had breached the verbal agreement because the Web Blaster incorporated "many of the ideas" he disclosed at the meeting and Marvel had not compensated him for its use of those ideas.

The district court granted Marvel's motion for summary judgment on the patent infringement claim, but found that there were genuine issues of material fact precluding summary judgment on the contract claim. A jury later found for Kimble on the contract claim, and the court entered a judgment awarding him 3.5% of past, present, and future Web Blaster "net product sales" (excluding sales of foam string refills). Kimble appealed the court's decision on the patent infringement claim, and Marvel appealed the verdict on the contract claim. Throughout all stages of the case, Kimble maintained that the Web Blaster infringed the '856 Patent while Marvel contended that it did not.

**C**

In 2001, the parties agreed to settle the case while the appeals were still pending. They accordingly executed a written agreement (the "Settlement Agreement") memorializing their agreement to: (a) withdraw their appeals; (b) stipulate to vacating the district court judgment; and (c) stipulate to dismissing the case with prejudice. Marvel also agreed to purchase the '856 Patent. The relevant section provided that:

> The purchase price for the Patent shall be payable to the Patent Holders as follows:
>
> a. $516,214.62 upon execution and delivery of this Agreement; and
>
> b. 3% of "net product sales" (as such term is used in the Judgment) excluding refill royalties made after December 31, 2000. For purposes of this paragraph 3.b, "net product sales" shall be deemed to include product sales that would infringe the Patent but for the purchase and sale thereof pursuant to this Agreement as well as sales of the Web Blaster product that was the subject of the Action and to which the Judgment refers.

The parties also agreed to a release, under which Kimble released Marvel except for Marvel's obligations under the Settlement Agreement itself, "and except for those obligations under the alleged verbal agreement that was the

subject of the Action." The agreement has no expiration date and does not include any specific time limit on Marvel's obligation to pay "3% of 'net product sales.'" At the parties' request, the district court entered an order vacating the judgment and dismissing the action with prejudice.

## D

Thereafter, the parties coexisted for several years without any significant disagreements. Web Blaster sales – and as a consequence, royalty payments over the life of the Settlement Agreement – were substantial. All together, Marvel paid Kimble more than $6 million in royalties.

But the peace did not last. In 2006, Marvel entered into a licensing agreement with Hasbro giving it the right to produce certain toys related to Marvel characters, including the Web Blaster. A number of disagreements subsequently arose between Marvel and Kimble concerning the royalty payments.[3] These disputes revolved around the calculation of royalties for subsequent iterations of the Web Blaster that included additional functions (in addition to shooting foam string) or Web Blasters that were packaged with other role

---

[3] Marvel intended to have Hasbro assume its responsibilities under the Settlement Agreement by requiring it to execute a sublicense agreement. Hasbro, however, did not execute the sublicense agreement at the same time that it executed the licensing agreement. Marvel, apparently, overlooked this. It later asked Hasbro to execute the agreement, but Hasbro refused. At oral argument, Marvel's counsel acknowledged that when the parties negotiated the Settlement Agreement, they were not aware of *Brulotte*. Consequently, had the Hasbro deal not occurred, it is quite possible that Marvel would have continued to pay Kimble under the Settlement Agreement beyond the expiration date of the patent without dispute.

play items (such as Spider-Man masks). In their discussions, Kimble initially took the position that royalties were due for these products under the Settlement Agreement because they "would infringe the Patent."

Kimble filed suit in Arizona state court for breach of contract and related claims. Marvel removed based on diversity of citizenship. Marvel then counterclaimed seeking, among other things, a declaration that it was no longer obligated to pay Kimble under the Settlement Agreement "based on the sales of products after the expiration of the '856 patent." In discovery, Marvel reaffirmed its view that the Web Blaster never infringed the '856 Patent.

The parties filed summary judgment motions, which the district court referred to the magistrate judge for a report and recommendation. *Kimble v. Marvel Enters., Inc.*, 692 F. Supp. 2d 1156, 1164 (D. Ariz. 2010). The magistrate judge found that under *Brulotte*, Kimble could not recover royalties under the Settlement Agreement beyond the expiration date of the '856 Patent. *Id.* at 1167–69 (discussing *Brulotte v. Thys Co.*, 379 U.S. 29 (1964)). He reasoned that the Settlement Agreement transferred patent rights, and that it was less clear that it transferred any non-patent rights. *Id.* at 1167–68. He observed that the release clause "more reasonably suggests that Plaintiffs reserved the non-patent rights from the verbal agreement and did not transfer them to Marvel." *Id.* at 1168. Alternatively, he found that *Brulotte* applied because the Settlement Agreement was a "hybrid" agreement transferring inseparable patent and non-patent rights, and because the patent rights were used as leverage to negotiate the agreement. *Id.* at 1168–69.

Kimble objected, arguing "that the Agreement transferred both patented and non-patented rights and while the royalties for the patent rights end with the patent, they do not end for the non-patented rights which cover the Web Blaster." *Id.* at 1159. The district court nonetheless adopted the recommendation over Kimble's objection. *Id.* at 1159–63. It noted that the Settlement Agreement could be read as transferring both patent rights and "the rights to the toy idea(s) verbally exchanged" between the parties in 1990, but rejected Kimble's argument that it created "separable" patent and non-patent rights because it made "no distinction between the royalties for these two" categories. *Id.* at 1160. Accordingly, the district court agreed that the Settlement Agreement was a "hybrid" and that the royalties had to end when the patent expired. *Id.* at 1159–61. Kimble now appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

We review the district court's decision to grant summary judgment de novo. *Michelman v. Lincoln Nat'l Life Ins. Co.*, 685 F.3d 887, 892 (9th Cir. 2012). We "must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id*. (quoting *Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 996 (9th Cir. 2012) (internal quotation marks omitted)).

## III

## A

Before analyzing the parties' arguments, we review *Brulotte* and its progeny. In *Brulotte v. Thys Co.*, 379 U.S. 29, 29 (1964), the owner of patents for a hop-picking machine sold machines to two purchasers along with licenses for their use. The purchasers paid a flat sum for the machines, but also had to make seasonal royalty payments. *Id.* The licenses also precluded the purchasers from assigning the licenses or moving the machines outside of the county. *Id.* The purchasers eventually stopped making royalty payments, arguing that the owner had misused the patents by extending the license agreements beyond the expiration dates of the patents. *Id.* at 30. The Supreme Court agreed, concluding "that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." *Id.* at 32.

The Court explained that Congress had granted inventors "the exclusive right" to make, use, or sell their discoveries "for limited times." *Id.* at 30 (quoting U.S. Const. art. 1, § 8) (internal quotation marks omitted). After the relevant period expires,[4] however, "these rights become public property." *Id.* at 31. Any attempt to reserve or continue the patent

---

[4] When *Brulotte* was decided, the statute provided a seventeen-year period of exclusivity. *Id.* at 30–31 (citing, inter alia, 35 U.S.C. § 154). Congress subsequently revised the statute to provide a term beginning on the date of issuance and ending twenty years from the date of the application, in most cases. 35 U.S.C. § 154(a)(2). The term may be extended where the U.S. Patent and Trademark Office fails to issue the patent within three years of the application's filing date. *Id.* § 154(b)(1)(B).

monopoly after expiration "runs counter to the policy and purpose of the patent laws" regardless of what "legal device" is employed. *Id.* (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)).

The Court found that the annual payments were not designed merely to compensate the owner for the use during the patent term because the parties had agreed on a flat sum as the purchase price for the machine and the royalty payments covered the use of the machine for each year. *Id.* Thus, the payments due in "the post-expiration period [we]re by their terms for use during that period, and [we]re not deferred payments for use during the pre-expiration period." *Id.* Similarly, the Court rejected the argument that the license was merely an arrangement for payment based on the amount of use. *Id.* at 31–32. Thus, "[t]he sale or lease of unpatented machines on long-term payments based on a deferred purchase price or on use would present wholly different considerations." *Id.* at 32. The Court also noted that the license agreement precluded assignment or removal of the machines from the county both before and after expiration of the patents. *Id.* at 31–32.

Because the licenses made no distinction "between the term of the patent and the post-expiration period," they were "on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they d[id] for the monopoly period." *Id.* at 32. The Court was consequently "unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage." *Id.* Thus, the patent owner could not use that leverage to project the patent monopoly beyond the

expiration of the patent because, if it was permissible to do so, "the free market visualized for the post-expiration period would be subject to monopoly influences that have no proper place there." *Id.* at 32–33.

In contrast, in *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262–66 (1979), the Supreme Court found that patent law did not preclude the enforcement of an agreement to provide royalty payments indefinitely where no patent had issued. In that case, the petitioner had invented a keyholder and filed a patent application. *Id.* at 259. The design was "ingenious" but also "so simple that it readily could be copied unless it was protected by patent." *Id.* The respondent had agreed that it would pay the petitioner a five percent royalty for the exclusive right to manufacture and sell the keyholder. *Id.* The parties had also agreed, however, that if the patent application was "not allowed within five (5) years" the respondent "would pay two and one half percent (2 ½%) of sales so long as [it] continue[d] to sell" the keyholder. *Id.* (original alteration marks omitted). The petitioner did not obtain the patent within five years, and the Board of Patent Appeals subsequently issued a final rejection of her application. *Id.* at 260. After the keyholder proved successful, but also subject to widespread copying by competitors, the respondent sued, seeking a declaration that the contract was preempted by patent law. *Id.*

The Court found that the agreement was "not inconsistent" with patent law principles, as it did "not withdraw any idea from the public domain." *Id.* at 262–63. It noted that the petitioner had disclosed the design to the respondent in confidence, and had the respondent "tried to exploit the design in breach of that confidence, it would have risked legal liability." *Id.* at 263. The agreement would

"merely require[ the respondent] to pay the consideration which it promised in return for the use of a novel device which enabled it to pre-empt the market." *Id.* at 264. Nonetheless, it accepted that had the petitioner obtained the patent, "she would have received a 5% royalty only on keyholders sold during the 17-year life of the patent." *Id.* at 263–64.

The Court distinguished *Brulotte*, indicating that "the reduced royalty which is challenged, far from being negotiated 'with the leverage' of a patent, rested on the contingency that no patent would issue within five years." *Id.* at 264–65 (discussing 379 U.S. at 33). The Court further explained:

> No doubt a pending patent application gives the applicant some additional bargaining power for purposes of negotiating a royalty agreement. The pending application allows the inventor to hold out the hope of an exclusive right to exploit the idea, as well as the threat that the other party will be prevented from using the idea for 17 years. However, the amount of leverage arising from a patent application depends on how likely the parties consider it to be that a valid patent will issue. Here, where no patent ever issued, the record is entirely clear that the parties assigned a substantial likelihood to that contingency, since they specifically provided for a reduced royalty in the event no patent issued within five years.

> This case does not require us to draw the line between what constitutes abuse of a pending application and what does not. It is clear that whatever role the pending application played in the negotiation of the 5% royalty, it played no part in the contract to pay the 2 ½% royalty indefinitely.

*Id.* at 265. Accordingly, patent law was not a "barrier" to the contract. *Id.* at 266.

In light of these decisions, several of our sister circuits have applied the *Brulotte* rule to preclude the payment of royalties beyond the expiration date of patents under so-called "hybrid" agreements encompassing inseparable patent and non-patent rights. *Meehan v. PPG Indus., Inc.*, 802 F.2d 881, 884–86 (7th Cir. 1986) (discussing *Pitney Bowes* and *Boggild* with approval and applying *Brulotte* where agreement conveyed patent rights in addition to trade secrets); *Boggild v. Kenner Prods.*, 776 F.2d 1315, 1319–20 & n.5 (6th Cir. 1985) (discussing *Pitney Bowes* and *Aronson*, 440 U.S. at 263–64); *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1371–72 (11th Cir. 1983) (discussing *Brulotte*, 379 U.S. at 32, and *Aronson*, 440 U.S. at 261).

In *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1016, 1019–22 (9th Cir. 2007), we applied *Brulotte* in a case where the patent owner had relinquished all patent and other rights in a product in exchange for a royalty in perpetuity. In that case, the inventor's patent application was pending when the parties entered into the royalty agreement. *Id.* at 1017. The patent later issued, but the royalty rate was not contingent on issuance, nor was there any discount for the post-expiration period. *See id.*

We initially observed that *Brulotte* "runs counter to the usual task in a contract case – to interpret the terms agreed to by the parties." *Id.* at 1019. Moreover, we acknowledged that *Brulotte* renders some aspects of otherwise valid contracts unenforceable "for a reason that many courts and commentators have found economically unconvincing, namely, that 'the free market visualized for the post-expiration period would be subject to monopoly influences' if 'a royalty agreement was allowed to project beyond the expiration date of the patent.'" *Id.* at 1019–20 (quoting *Brulotte*, 379 U.S. at 32–33) (alteration marks and footnote omitted). Thus, we acknowledged that we were bound to apply *Brulotte*'s holding, but that we need not and should not "expand *Brulotte*'s holding beyond its terms." *Id.* at 1020.

We then went on to discuss the state of the law after the *Aronson* decision. We explained that "[t]he distinction between the contract in *Brulotte* and the one in *Aronson* rested, according to the Court, on the fact that the extended royalty term in *Aronson* was not 'negotiated with the leverage of a patent but rested on the contingency that no patent would issue within five years.'" *Id.* at 1020 (quoting *Aronson*, 440 U.S. at 265) (alteration marks and internal quotation marks omitted). We noted that other circuits had read *Brulotte* and *Aronson* "to create two bright-line rules: (1) If a patent ever issues on an invention, *Brulotte* applies, and no contract can properly demand royalty payments after the patent expires; and (2) a contract that provides for royalties either when a patent expires or when it fails to issue cannot be upheld unless it provides a discount from the alternative, patent-protected rate." *Id.* at 1021 (citing *Meehan*, 802 F.2d at 884–85; *Boggild*, 776 F.2d at 1319–20; *Pitney Bowes*, 701 F.2d at 1372–74).

We observed that *Brulotte* and *Aronson* did not necessarily compel these rules. We suggested that *Brulotte* turned on the existence of the onerous use restrictions unrelated to the royalty. *Id.* at 1021 (citing *Brulotte*, 379 U.S. at 29, 31–32). It was those restrictions that showed that the unchanging royalty rate was significant and that the patent owner "was acting *in all respects* as if the patent remained in place." *Id.* (citing *Brulotte*, 379 U.S. at 32). *Aronson*, in contrast, involved a sale of pure intellectual property that had value apart from the patent. *Id.* at 1022 (citing *Aronson*, 440 U.S. at 261–63, 265). The language in *Aronson* suggesting that the patent owner in that case could not have received the full patent royalty beyond the patent term "was counterfactual dicta, neither supported by any analysis nor necessary for the decision." *Id.* at 1022. Nonetheless, we reluctantly followed the other circuits' "consensus" in light of the "particularly strong national uniformity concerns" present in patent cases. *Id.* Accordingly, we found that *Brulotte* rendered the agreement unenforceable to the extent it required royalty payments beyond the expiration date of the patent, but rejected several other arguments to extend the rule. *Id.* at 1022–26 (holding, inter alia, that *Brulotte* did not apply to a foreign patent).

The rule that follows, in relevant part, is that a license for inseparable patent and non-patent rights involving royalty payments that extends beyond a patent term is unenforceable for the post-expiration period unless the agreement provides a discount for the non-patent rights from the patent-protected rate. This is because – in the absence of a discount or other clear indication that the license was in no way subject to patent leverage – we presume that the post-expiration royalty payments are for the then-current patent use, which is an improper extension of the patent monopoly under *Brulotte*.

**B**

Kimble argues that the Settlement Agreement distinguishes between patent and non-patent rights, that both parties now agree that the Web Blaster did not infringe the '856 Patent, and therefore, that *Brulotte* does not apply to the Web Blaster royalty payments. We cannot agree because the agreement plainly involved one royalty rate for both patent and Web Blaster rights, with no discount or other clear indication that the Web Blaster royalties were not subject to patent leverage.

Kimble's primary contention is that the Settlement Agreement provided two separate royalty rates (which were both 3%) for the patented rights and the non-patented Web Blaster rights. Putting aside for the moment the fact that there is admittedly no discounted rate for non-patent rights, Kimble's argument is not supported by the language of the Settlement Agreement. *Cf. Meehan*, 802 F.2d at 885–86 (rejecting a similar argument that a royalty merely related to trade secrets based on the terms of the agreement). The Settlement Agreement provided that Marvel would purchase the '856 Patent for a lump sum plus a continuing royalty of "3% of 'net product sales.'" The agreement then defined "net product sales" as including "product sales that would infringe the Patent but for the purchase and sale thereof pursuant to this Agreement as well as sales of the Web Blaster product."

Thus, the Settlement Agreement contemplated one royalty for patent rights and Web Blaster rights. At the time the parties negotiated the agreement, the patent infringement claim was not definitively resolved. The district court had found that the Web Blaster did not infringe the patent, but Kimble was appealing that decision. Because the

infringement claim remained disputed, it was necessary for the parties to specifically include "Web Blaster" sales in addition to sales of products that allegedly infringed the patent to resolve their dispute. This, however, did not create a distinct royalty for non-patent rights. To the contrary, the structure of the agreement demonstrates that the rights were intertwined and cannot be separated in any principled manner. Tellingly: (a) the purpose of the entire provision was to set the sale price for *the patent*; (b) *all* rights were encompassed within the definition of "net product sales" used to calculate a single royalty; and (c) the agreement specifically referred to "Web Blaster" sales, as opposed to sales of products utilizing ideas and know-how covered by the verbal agreement. The agreement was structured this way because, at that time, it was unclear whether Web Blaster sales infringed the patent, violated the verbal agreement, or both. If there were two distinct royalties at issue, the parties could have easily specified as much. Their failure to do so is dispositive.

The Settlement Agreement also did not include a discounted rate for the alleged non-patent rights. Some language in prior opinions suggests that the failure to include a discounted rate is a per se violation of *Brulotte*. *See Zila*, 502 F.3d at 1021 (discussing cases). Of course, the point of requiring a discount from the patent-protected rate is that it shows that the royalty at issue was not subject to patent leverage. *See Brulotte*, 379 U.S. at 32; *see also Aronson*, 440 U.S. at 265 (finding that the discounted rate demonstrated that the patent "played no part" in the agreement to pay the lower royalty indefinitely); *Pitney Bowes*, 701 F.2d at 1372 n.12 ("The implication of this language [in *Brulotte*] is that, if a patent owner can prove that he did not use his patent monopoly leverage to exact reduced

post-expiration trade secret payments, then there would be no direct conflict with federal law and the agreement would be enforced."). We do not think that the "discount" requirement should be applied inflexibly without reference to its purpose. Consequently, even though a discounted rate may not be necessary to avoid *Brulotte* in every case, in the absence of a discounted rate, there must be some other clear indication that the royalty was in no way subject to patent leverage. *See Meehan*, 802 F.2d at 886 ("Although it is true . . . that parties can contract for trade secret payments to extend beyond the life of a patent, there must be some provision that distinguishes between patent royalties and trade secret royalties."). Here, there is no such indication.[5] *See id.*

Kimble also argues that the Settlement Agreement's 3% rate represents a "discount" from the district court judgment's 3½ % rate. Kimble is essentially arguing that because the rate in the judgment was higher, there was a "discount" in the final agreement. Kimble's argument misconstrues the significance of a discounted rate in the *Brulotte* analysis. The rates in the agreement at issue are what matters, not the rates in the long-since vacated judgment. In the Settlement Agreement, there was only one rate for all rights, and it was the same for both patent and Web Blaster rights. Moreover, where a first rate is higher and is not subject to patent leverage, that does not show that a second, lower rate encompassing both patent-protected and non-patent protected

---

[5] We note, for example, that had the parties explicitly indicated, in a separate section of the agreement, that royalty payments for sales of non-patented products, including the Web Blaster, were to be paid in settlement of Kimble's claims that Marvel used the ideas and know-how he verbally disclosed at the 1990 meeting without compensation, it would arguably be immaterial if the rate were the same as the rate for sales of allegedly patent-infringing products.

rights was not subject to patent leverage. The "discount" from the rate in the judgment to the Settlement Agreement reflected the fact that Kimble might not prevail on appeal, not that the rights at issue were not subject to patent leverage.

Kimble further contends that this case is distinguishable because it involved a "hybrid" *agreement*, that coincidentally included both patent and non-patent rights, as opposed to a "hybrid" *product*, consisting of both patented and non-patented ideas. *Cf. Boggild*, 776 F.2d at 1319 (applying *Brulotte* to a "patented item"). The flaw with Kimble's argument is that at the time of the Settlement Agreement, it was uncertain whether the Web Blaster sales infringed the '856 Patent and the Settlement Agreement does not contain any clear indication that the Web Blaster royalties were not subject to patent leverage.

Kimble's primary leverage in negotiating the settlement was undoubtedly the jury verdict on the contract claim. Generally speaking, a party who prevailed before the district court has the better chance of prevailing on appeal. *See, e.g.*, *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) ("Judicial precedents are presumptively correct . . . ." (internal quotation marks omitted)).[6] However, contrary to Kimble's recent suggestion that he agrees that the

---

[6] The Settlement Agreement was dated September 21, 2001. For the twelve-month period ending September 30, 2002, we affirmed on the merits 968 of 1,244, or 77.8%, of "other private civil" appeals (i.e., civil appeals excluding prisoner petitions, administrative appeals, bankruptcy cases, and cases involving the federal government). Administrative Office of the United States Courts, *2002 Annual Report of the Director: Judicial Business of the United States Courts* 99 (2003), *available at* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2002/ appendices/b05sep02.pdf (last visited July 3, 2013).

Web Blaster never infringed the '856 Patent, at the time of the negotiations, he was challenging the district court's decision and likely derived some amount of leverage from his patent infringement appeal.  Even if this patent leverage was significantly less than the leverage that Kimble derived from the jury verdict on his contract claim, *Brulotte* applies because it is impossible to tell "what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage."  *Brulotte*, 379 U.S. at 32.  Thus, the patent rights and any non-patent rights were intertwined and *Brulotte*'s presumption must apply.

## IV

We acknowledge our application of the *Brulotte* rule in this case arguably deprives Kimble of part of the benefit of his bargain based upon a technical detail that both parties regarded as insignificant at the time of the agreement. Indeed, as the Seventh Circuit has explained, *Brulotte* has been criticized for exactly that reason:

> The Supreme Court's majority opinion reasoned that by extracting a promise to continue paying royalties after expiration of the patent, the patentee extends the patent beyond the term fixed in the patent statute and therefore in violation of the law.  That is not true.  After the patent expires, anyone can make the patented process or product without being guilty of patent infringement.  The patent can no longer be used to exclude anybody from such production.  Expiration

thus accomplishes what it is supposed to accomplish. For a licensee in accordance with a provision in the license agreement to go on paying royalties after the patent expires does not extend the duration of the patent either technically or practically, because . . . if the licensee agrees to continue paying royalties after the patent expires the royalty rate will be lower. The duration of the patent fixes the limit of the patentee's power to extract royalties; it is a detail whether he extracts them at a higher rate over a shorter period of time or a lower rate over a longer period of time.

*Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1017 (7th Cir. 2002).[7]

---

[7] We previously acknowledged these criticisms in *Zila*, 502 F.3d at 1019 n.4 (collecting authorities). *Accord Brulotte*, 379 U.S. at 34–39 (Harlan, J., dissenting); U.S. Dep't of Justice & FTC, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* 12, 116–19, 122–23 (2007) (discussing criticisms of *Brulotte* and concluding that permitting patent holders to enter agreements requiring royalty payments beyond the expiration of the patent "can be efficient" in that it will "reduce[] deadweight loss associated with a patent monopoly and allow[] the patent holder to recover the full value of the patent, thereby preserving innovation incentives"), *available at* http://www.ftc.gov/ reports/innovation/P040101PromotingInnovationandCompetitionrpt070 4.pdf (last visited July 3, 2013); Richard Gilbert & Carl Shapiro, *Antitrust Issues in the Licensing of Intellectual Property: The Nine No-No's Meet the Nineties*, in *Brookings Papers on Economic Activity: Microeconomics* 233, 322 (1997) (concluding that the "[l]egal reasoning here, based on the notion that extending the royalties in time is to 'enlarge the monopoly of the patent,' although rhetorically appealing, does not seem to

The Seventh Circuit's criticism is particularly apt in this case. The patent leverage in this case was vastly overshadowed by what were likely non-patent rights, and Kimble may have been able to obtain a higher royalty rate had the parties understood that the royalty payments would stop when the patent expired. Nonetheless, *Brulotte* and its progeny are controlling. We are bound to follow *Brulotte* and cannot deny that it applies here. Accordingly, the district court's judgment is **AFFIRMED.**[8]

---

reflect commercial reality or basic economics"), *available at* http://www.brookings.edu/~/media/Projects/BPEA/1997%20micro/ 1997_bpeamicro_gilbert.PDF (last visited July 3, 2013).

[8] In a related case, Kimble contends that Marvel breached the verbal agreement by failing to compensate him after the expiration of the patent for its use of his ideas. The district court granted summary judgment for Marvel, finding that the Settlement Agreement unambiguously barred the claim. In an unpublished decision, we reversed, finding the agreement ambiguous under New York law. *Marvel Entmt., LLC v. Kimble*, __ Fed. App'x __, No. 12-15315 (9th Cir. July 16, 2013). Indeed, Kimble's claim under the verbal agreement may be consistent with the Seventh Circuit's suggestion that a patent holder might be able to recover under a quantum meruit theory if the amount of royalties paid was lower than the fair market value of the defendant's use of the license given that illegal contracts are treated as rescinded, placing the parties back in the positions they would have occupied had the contract never been made in the first place. *See Scheiber*, 293 F.3d at 1022–23; *see also Zila*, 502 F.3d at 1023 (indicating that under *Scheiber*, the portion of the licensing agreement that seeks to extend the patent term is void). In that case, much like a quantum meruit plaintiff, Kimble is essentially asking to be placed in the position that he would have occupied had the Settlement Agreement never been made. Like the Seventh Circuit, we do not read *Brulotte* to preclude such a claim.