## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CORTEVA AGRISCIENCE LLC )
and AGRIGENETICS, INC., )
                                 )
                Plaintiffs, )
                                 )
      v.                          )     **C.A. No. N22C-10-293**
                                 )                 **PRW CCLD**
MONSANTO COMPANY and )
BAYER CROPSCIENCE LP., )
                                 )
               Defendants. )

Submitted: August 13, 2024
Decided: September 16, 2024

*Upon Plaintiffs' Motion for Summary Judgment,*
**DENIED.**

*Upon Defendants' Motion for Summary Judgment,*
**GRANTED.**

## MEMORANDUM OPINION AND ORDER

Chad S.C. Stover, Esquire, BARNES & THORNBURG LLP, Wilmington, Delaware; Craig A. Thompson, Esquire, VENABLE LLP, Baltimore, Maryland; Frank C. Cimino, Jr., Esquire (*argued*), and Charles J. Monterio, Jr., Esquire, VENABLE LLP, Washington, District of Columbia, *Attorneys for Plaintiffs Corteva Agriscience LLC and Agrigenetics, Inc.*

Rodger D. Smith II, Esquire, Ryan D. Stottman, Esquire, and Rachel R. Tunney, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Amanda J. Hettinger, Esquire (*argued*), Anthony F. Blum, Esquire, and Daniel A. Garcia, Esquire, THOMPSON COBURN LLP, St. Louis, Missouri, *Attorneys for Defendants Monsanto Company and Bayer Cropscience LP.*

**WALLACE, J.**

Over twenty years ago, Plaintiffs and Defendants entered into a licensing agreement to sell corn containing a patented gene. Under the agreement, Plaintiffs agreed to pay Defendants royalties based on a specified sales percentage. The agreement didn't identify an end date for those royalty payments but did provide a term of life for the agreement at-large. According to that term's language, the licensing agreement would expire when the last patent expires.

Some of those patents have now expired. Yet, Defendants still ask for royalties even on those now-expired patents. They say that the agreement's royalty provisions survive so long as the agreement survives. Plaintiffs think not. They say the licensing agreement calls for royalties on a country-specific basis such that royalties are no longer owed on expired patents. Both sides have now moved for summary judgment urging adoption of their preferred reads.

It's evident that these parties intended for one royalty rate calculation to apply to all worldwide patents. That means that the patents are treated collectively for royalty purposes. And since the agreement's term ends when the last patent expires, the royalty provision thus extends royalties owed on all patents until that final expiration occurs.

But, Plaintiffs insist, if that is so—if the licensing agreement's term does apply to the royalty provisions—then the agreement is unlawful under certain United States Supreme Court precedent. It isn't. The precedent Plaintiffs rely on is

inapplicable here. The agreement is a latest-running-patent agreement, and Plaintiffs paid for the privilege to use both the patents and certain corresponding research for the agreement's entire term.

Accordingly, and for the reasons now further explained: Defendants' Motion for Summary Judgment is **GRANTED**; Plaintiffs' Motion for Summary Judgment is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Monsanto is a Delaware corporation with its principal offices in St. Louis, Missouri.[1] Bayer CropScience is a Delaware limited partnership.[2] "Monsanto and Bayer CropScience are wholly owned by Bayer AG and part of its Crop Science Division."[3]

Corteva Agriscience is a Delaware limited liability corporation with a place of business in Wilmington, Delaware.[4] Agrigenetics is a Delaware corporation with its principal offices in Indianapolis, Indiana.[5] Agrigenetics is a subsidiary of Corteva Agriscience.[6]

---

[1] Complaint for Declaratory Judgment ("Compl."), Ex. A ("Agreement") § 1.01 (D.I. 1).

[2] Compl. ¶ 9.

[3] *Id*. ¶ 16. For ease of reference, Defendants are hereafter collectively referred to as "Bayer."

[4] *Id*. ¶ 6.

[5] Agreement § 1.02.

[6] Compl. ¶ 15. For ease of reference, Plaintiffs are collectively hereafter referred to as

## B. THE NK603 EVENT

In the late 1990s, Bayer developed an herbicide-resistant corn product.[7] Numerous global patents were awarded to Bayer based on "the biotech corn event known as the NK603 event."[8] In 2000, the United States deregulated the "use of the glyphosate tolerant corn event NK603."[9] It was commercialized in 2001.[10]

## C. THE NK603 LICENSE AGREEMENT

In September 2002, Bayer and Agrigenetics entered into the "Roundup Ready (NK603) Corn License Agreement" (the "Agreement"). The Agreement provided Agrigenetics with a license "of certain patent rights and proprietary technology of MONSANTO for use in producing Corn plants that are tolerant to Glyphosate herbicide" in return for royalty payments.[11] As described in Agreement Section 1.05, Agrigenetics was "interested in the commercialization of Corn" and sought "to obtain a limited license under MONSANTO's proprietary rights."[12] In turn, Bayer

---

"Corteva."

[7] *Id*. ¶ 17.

[8] *Id*. ¶ 18 ("When herbicide, specifically glyphosate, is sprayed over the top of glyphosate-resistant corn, the herbicide kills harmful weeds that compete with the corn plants but leave the herbicide resistant corn unaffected.").

[9] *Id*.

[10] *Id*.

[11] Agreement at 1; *see also id*. §§ 1.01-1.05. Agrigenetics is the designated "LICENSEE" in the Agreement. *Id*. § 1.02. The Agreement was subsequently amended three times. *See* Compl., Exs. B-D. For ease of reference, the Court will herein refer to the Agreement and its amendments as a singular agreement unless noted otherwise.

[12] Agreement § 1.05.

"desire[d] to grant such license[.]"[13]

The Agreement defines certain terms. Most importantly, "Territory" is defined as "the United States of America and Canada and all other countries of the world, if registration is required in a given country, that country shall not be included in the Territory until MONSANTO obtains a registration for Corn Line NK603 in the subject country."[14]

Agreement Section 3 is titled "Conveyance of Rights."[15] Under sub-section (a):

> MONSANTO hereby grants to LICENSEE, and LICENSEE hereby accepts, on and subject to the terms and conditions of this Agreement, without the right to sublicense or otherwise transfer, a non-exclusive license within the Licensed Field in the Territory under MONSANTO Patent Rights, MONSANTO Know-How, Biological Materials and Licensed Patent Rights to develop, produce, have produced, and sell Licensed Corn Products to Corn growers licensed by MONSANTO and to develop, produce, have produced, but not sell, not license or otherwise convey rights to, Corn inbred or parent lines required for development and production of Licensed Com Products.[16]

---

[13]  *Id.*

[14]  *Id.* § 2.22.

[15]  *Id.* § 3.

[16]  *Id.* § 3.01.  Relevant defined terms mentioned therein include:

"Biological Materials": "Corn Line NK603 and/or any biological material or germplasm based on Corn Line NK603," which is a "transgenic corn line" identified by the U.S. Department of Agriculture. *Id.* §§ 2.02, 2.07.

"MONSANTO Know-How": "knowledge and information" relating to the Biological Materials "reasonably needed for commercialization of Licensed Corn Products." *Id.* § 2.16.

"MONSANTO Patent Rights": "all patent rights owned by MONSANTO that claim priority to a MONSANTO-owned patent application filed on or before the

Agreement Section 4.01 outlines royalty payments. As amended, sub-section (a) says that "[t]he base Royalty shall be the lower of the following":

(i) In each country of the Territory, LICENSEE'S Corn Line NK603 Royalty will be the lower of: (1) ▮▮▮▮ percent (▮%) of industry-standard gross royalty prior to any adjustment for payment of seed service fees (IST), but not more than $▮▮▮▮/Unit) or (2) ▮▮▮▮ percent (▮%) of the industry-standard net royalty (i.e. IST less the industry-standard seed service fee); provided however that, in the event that there is no third party licensing in a subject country of the Territory, then LICENSEE'S royalty rate shall be ▮▮▮▮ percent (▮%) of the Corn Line NK603 (or its current glyphosate tolerant commercial event) premium that MONSANTO seed companies charge to growers in the MONSANTO corn brand in the subject country.[17]

According to sub-section (c):

> On or before March 1 each year, MONSANTO shall notify LICENSEE of its plans for the Royalty for the subsequent crop year (e.g., March 2003 for the 2004 Fiscal Year). The notice provisions of this Subsection 4.01(c) shall not obligate MONSANTO to charge the Royalty disclosed pursuant to Subsection 4.01, but in no event shall the applicable Royalty exceed the noticed amount.[18]

---

Effective Date of this Agreement that directly relate to Corn that is tolerant to Glyphosate herbicide, including but not limited to, the MONSANTO-owned patents and patent applications listed in Appendix A and any and all patents maturing from these applications or maturing from applications that are divisionals, continuations continuations-in-part of these applications in the Territory and all reissues or extensions of any of the foregoing." *Id*. § 2.17.

"Licensed Patent Rights": "the patents and patent applications listed in Appendix A which may be amended by MONSANTO from time to time and any and all patents maturing from these applications or maturing from applications that applications in the Territory and any and all reissues or extensions of any of the foregoing and any patents or patent applications relating directly to Licensed Com Products that MONSANTO hereafter licenses with a right to grant sublicenses to LICENSEE; provided however, MONSANTO shall have no obligation to obtain any such license from Third Parties." *Id*. § 2.14.

[17] Compl., Ex. C ("2007 Amendment") § 4.01(a)(i).

[18] Agreement § 4.01(c).

Agreement Section 9.01 defines the Agreement's "Term."[19]  It reads: "The term of this Agreement shall begin on the Effective Date of this Agreement and shall end upon the expiration of the last to expire of the MONSANTO Patent Rights and Licensed Patent Rights."[20]

Agreement Section 3.03 is titled "Marking of Licensed Corn Products" and requires the following notice to be marked on those products "to the extent such notice is applicable in the respective area":

> THE HERBICIDE RESISTANT TECHNOLOGIES INCORPORATED INTO THESE SEEDS ARE COVERED UNDER UNITED STATES PATENTS (To Be Provided By MONSANTO). NO LICENSE AND/OR SUBLICENSE IS CONVEYED TO USE THESE SEEDS SOLELY BY THE (PURCHASE/BAILMENT/TRANSFER) OF SUCH SEEDS. A LICENSE/SUBLICENSE UNDER SAID PATENTS MUST FIRST BE OBTAINED FROM MONSANTO COMPANY BEFORE THESE SEEDS CAN BE USED IN ANY WAY.[21]

Section 7.06, titled "Grant-back," specifies that:

> LICENSEE and its Affiliates agree to grant and hereby grant to MONSANTO and its Affiliates irrevocable options to world-wide, non-exclusive, royalty bearing licenses (with the right to grant sublicenses to their customers) under any patent rights currently owned or subsequently acquired by LICENSEE or any of its Affiliates which may prohibit or block, under any applicable patent infringement laws or regulations anywhere in the Territory, the sale or licensing of Biological

---

[19]  *Id*. § 9.01.

[20]  *Id*.; *see also id*. § 2.08 (defining "Effective Date").

[21]  *Id*. § 3.03 (capitalization and underlining in original).

Materials or Com Line NK603.[22]

## D. The U.S and Canadian Patent Expirations and This Dispute

From 2002 to 2022, the Agreement operated smoothly. Bayer provided a projected royalty forecast to Corteva for the United States, Canada, and other countries around the world for the subsequent fiscal year each March, and a final royalty amount owed each July.[23]

Monsanto's worldwide NK603 patents then began to expire.[24] Monsanto's last applicable U.S. patent covering the NK603 event, U.S. Patent No. 9,701,980 (the "U.S. Patent"), expired in November 2022.[25] Monsanto's last applicable Canadian patent expired in April 2022.[26] Monsanto's last applicable NK603 patent, located in Brazil, is expected to expire in 2028.[27]

In March 2022, Bayer provided Corteva with its forecasted royalties for the 2023 fiscal year.[28] That forecast included royalties for the soon-to-expire U.S. and

---

[22] *Id*. § 7.06.

[23] Compl. ¶¶ 55-56.

[24] *See id*. ¶ 58. In the United States, a patent grant "shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications [such as being designated as a continuation in part of an earlier patent application] from the date on which the earliest such application was filed." *Id*. (citing 35 U.S.C. § 154(a)(2)).

[25] *Id*. ¶ 42; *see id*., Ex. E (U.S. Patent); *id*., Ex. F (GEMAA Patent Expiration Notice).

[26] Compl ¶ 57; *id*., Ex. G ("Bayer FY2023 Royalty Forecast").

[27] Compl. ¶ 41.

[28] *See generally* Bayer FY2023 Royalty Forecast.

Canadian patents.[29]  Corteva responded by informing Bayer that "any attempt by Bayer to collect royalties in the United States for the NK603 event beyond November 2022 would be an impermissible extension of Bayer's patent monopoly."[30]  Bayer maintained its demand for unit royalties for each country under the Agreement for fiscal year 2023.[31]  Corteva filed suit.

## E.  PROCEDURAL BACKGROUND

Corteva initiated this action in October 2022, asking for: (i) declaratory judgment that Corteva would not breach the Agreement by refusing to pay post-patent-expiration U.S. royalties after November 2022[32] and (ii) if the Agreement is construed to require payment of post-patent expiration U.S. royalties beyond November 2022, such a claim for royalties constitutes patent misuse under Supreme Court precedent.[33]

In response, Bayer moved to dismiss the complaint.[34]  The Court denied that motion, finding that Corteva proffered a reasonable enough interpretation to survive the pleadings stage.[35]

---

[29]  *Id*. at 1.

[30]  Compl. ¶ 61; *id*., Ex. H (Corteva FY2023 Royalty Forecast Objection).

[31]  Compl. ¶¶ 63-65; *id*., Ex. J (Bayer FY2023 Final Royalty Notice).

[32]  Compl. ¶¶ 70-75.

[33]  *Id*. ¶¶ 76-79.

[34]  *See* Defs.' Mot. to Dismiss (D.I. 19).

[35]  D.I. 44 ("Order Den. Defs.' Mot. to Dismiss"); *see* D.I. 57 ("Mot. to Dismiss H'rg Tr.").

Following discovery, both parties now move for summary judgment.[36] The Court heard the parties at argument, and their cross-motions are now ripe for decision.[37]

## II. PARTIES' CONTENTIONS

Corteva and Bayer both move for summary judgment in their favor. For Count I, each party insists that the Agreement's plain language unambiguously supports its posited read.[38] Corteva interprets the Agreement's royalty provisions to require royalties to end in a particular country when the NK603 patents in that country expire—barring any country-specific post-expiration royalties.[39] Bayer interprets those same provisions as requiring Corteva to pay royalties—and most particularly, U.S. royalties—until the Agreement expires in 2028.[40]

Both parties move for summary judgment on Corteva's alternative Count II

---

[36] *See generally* Plaintiffs' Opening Brief in Support of its Motion for Summary Judgment ("Pls.' Mot. for Summ. J.") (D.I. 83); Opening Brief in Support of Defendants' Motion for Summary Judgment ("Defs.' Mot. for Summ. J.") (D.I. 85).

[37] After argument, Corteva filed a motion to supplement the record. *See* D.I. 115 (Plaintiffs' Motion to Supplement[] the Summary Judgment Record). The Court received and read that motion. But the Court need not, and did not, consider Corteva's supplemental motion in reaching its summary judgment decision here.

[38] Pls.' Mot. for Summ. J. at 12-19; Defs.' Mot. for Summ. J. at 7-14.

[39] Pls.' Mot. for Summ. J. at 12-16.

[40] Defs.' Mot. for Summ. J. at 7-13. Bayer also points to Corteva's royalty payments for an Argentinian patent after that patent's expiration as supposed evidence of Corteva's course of performance. *Id*. at 14. But Corteva's complaint and briefing make clear that any payments after patent expiration were made under protest. Compl. ¶ 69; Pls.' Mot. for Summ. J. at 7; Plaintiffs' Reply Brief In Support of its Motions For Summary Judgment ("Pls.' Re. Br.") at 12-13 (D.I. 100). So, this decision affords no weight to Corteva's course-of-performance argument.

as well.  Corteva contends that—should the Court choose Bayer's interpretation, then—the United States Supreme Court's decision in *Brulotte v. Thys Co.*[41] renders the Agreement's royalty provision unenforceable.[42]  Bayer counters that this Agreement differs from that considered in *Brulotte*, primarily calling upon *Kimble v. Marvel Ent., LLC*[43] for support.[44]

## III. STANDARD OF REVIEW

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[45]  The movant bears the initial burden of proving that its motion is supported by undisputed facts.[46]  If the movant meets its burden, the non-movant must show there is a "genuine issue for trial."[47]  To determine whether

---

[41]  379 U.S. 29 (1964).

[42]  Pls.' Mot. for Summ. J. at 19-26.

[43]  576 US. 446 (2015).

[44]  Defs.' Mot. for Summ. J. at 14-26.  Bayer also argues that, if the Court concludes that *Brulotte* makes the royalty obligation unenforceable, then *Brulotte*-informed federal patent law shouldn't preempt an otherwise enforceable contract under Delaware law. *Id*. at 26-28; Reply Brief in Support of Defendants' Motion for Summary Judgment ("Defs.' Re. Br.") at 20 (D.I. 101). Because *Brulotte* doesn't render the Agreement's royalty obligation unenforceable, the federal preemption issue need not be, and isn't, addressed here.

[45]  Del. Super. Ct. Civ. R. 56(c); *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021).

[46]  *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[47]  Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355. 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary

a genuine issue exists, the Court construes the facts in the light most favorable to the non-movant.[48]

The "Court may not be able to grant summary judgment 'if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record.'"[49] But "[i]f the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated [its] entitlement to judgment as a matter of law, then summary judgment is appropriate."[50]

"These well-established standards and rules apply in full when the parties have filed cross-motions for summary judgment."[51] Filing cross-motions for summary judgment doesn't act *per se* as a concession that there are no genuine factual disputes.[52] "But, where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits

judgment.").

[48] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

[49] *Radulski v. Liberty Mutual Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020) (quoting *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015)).

[50] *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996) (citing *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322 (Del. Super. Ct. 1973)).

[51] *Radulski*, 2020 WL 8676027, at *4 n.35 (collecting cases); *see also Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2023 WL 615997, at *8 (Del. Super. Ct. Jan. 23, 2023).

[52] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

based on the record submitted with them."[53]

## IV. DISCUSSION

### A. THE AGREEMENT REQUIRES ROYALTY PAYMENTS ON ALL PATENTS UNTIL THE LAST OF THEM EXPIRES.

Corteva interprets the Agreement to require royalties on a country-by-country basis. In Corteva's view, that means an expired country-specific patent ends royalty obligations for that patent, while the last-to-expire patent ends the Agreement at large.[54] Bayer counters that the Agreement provides for royalties owed on all patents worldwide, and that obligation lasts until the Agreement's Term ends.[55] Both parties agree that there remains no material factual dispute.[56]

Both parties also agree that Delaware law governs the Agreement. In Delaware, a contract's proper construction is a question of law.[57] "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."[58] And "[w]hen the contract is clear and unambiguous, [the Court] will give effect to the plain-

---

[53] *Radulski*, 2020 WL 8676027, at *4 (cleaned up).

[54] Pls.' Mot. for Summ. J. at 12-16.

[55] Defs.' Mot. for Summ. J. at 9-12.

[56] Pls.' Mot. for Summ. J. at 1; Defs.' Mot. for Summ. J. at 7.

[57] *E.g.*, *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017).

[58] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted).

meaning of the contract's terms and provisions."[59]  But a contract may be deemed ambiguous when it is subject to multiple reasonable interpretations.[60]  When a contract is ambiguous, that "rais[es] factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision[s] in light of the expectations of the contracting parties."[61]

In denying Bayer's previous motion to dismiss, the Court identified four provisions that might be viewed as ambiguous: Territory, Royalty, Term, and Severability.[62]  On the limited record before it, and applying Rule 12(b)(6)'s reasonable conceivability standard, the Court found Corteva's proffered interpretation sufficient to survive the pleadings stage—a low bar.  So, the Court denied the motion to dismiss, and the parties moved on to discovery.

Three of those four provisions remain disputed now.  "Territory" is defined as "the United States of America and Canada and all other countries of the world . . . ."[63]  The Agreement granted Corteva a "non-exclusive license within the Licensed Field in the Territory under MONSANTO Patent Rights, MONSANTO

---

[59]  *Id.* at 1159-60 (citation omitted); *see also Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[60]  *Osborn*, 991 A.2d at 1160.

[61]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1229 (Del. 1997).

[62]  Mot. to Dismiss H'rg Tr. at 35-37.

[63]  Agreement § 2.22.

Know-How, Biological Materials and Licensed Patent Rights to develop, produce, and sell Licensed Corn Products . . . ."[64] Per the Agreement's royalty provisions, the "base Royalty" "in each country of the Territory" is calculated using a set percent rate.[65] And the Agreement's Term "shall end upon the expiration of the last to expire of the MONSANTO Patent Rights and the Licensed Patent Rights."[66]

The Agreement's core ambiguity lies in the relationship between the Term and the royalty provisions. Specifically, the Agreement fails to address how the Term applies to Section 4.01's royalty obligations. Are royalties owed on all patents in the Territory until the longest lasting patent expires? Or do royalty obligations for a country-specific patent end when that patent expires? Put more simply: when do royalty obligations end under the Agreement?

The evidence unearthed during discovery is of little help. The deposed corporate representatives all based their interpretations of the Agreement solely on the Agreement's plain language.[67] And there was no unearthing of contemporaneous communications between the parties from the time the Agreement was signed.

If contract language is deemed ambiguous, the Court may consider extrinsic

---

[64] *Id*. § 3.01.

[65] 2007 Amendment § 4.01.

[66] Agreement § 9.01.

[67] *See* Defs.' Mot. for Summ. J., Ex. 8 (Corteva 30(b)(6) Dep. Tr.) at 21, 111-24; *id*., Ex. 9 (Bayer 30(b)(6) Dep. Tr.) at 20; Pls.' Mot. for Summ. J., Ex. L (Bayer and Monsanto 30(b)(6) Dep. Tr.) at 15-20.

evidence.[68]   Here, one vein of such evidence stands out.   Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry."[69]   A court might consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."[70]   After examining the relevant extrinsic evidence, "a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation."[71]

The Agreement—originally entered in 2002—was subsequently amended multiple times.   Importantly, the 2002 version featured different royalty provisions in its section 4.01 than the current version.[72]   In the 2002 version, the "base Royalty" amounts were spelled out as follows:

(i) For *the countries of the United States and Canada*, the applicable Royalty for Fiscal Year 2003 shall be [at specified rates];

(ii) For *other countries of the Territory* for all Fiscal Years, the Royalty shall be [at specified rates];

(iii) For *the countries of United States and Canada* for all Fiscal Years after

[68]   *E.g.*, *Salamone v. Gorman*, 106 A.3d 354, 369-70 (Del. 2014).

[69]   *Id.* (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alterations in original)).

[70]   *Eagle Indus., Inc.*, 702 A.2d at 1233.

[71]   *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (quoting *U.S. West v. Time Warner Inc.*, 1996 WL307445, at *10 (Del. Ch. May 6, 1996)).

[72]   *Compare* Compl., Ex. C ("2007 Amendment") § 4.01, *with* Agreement § 4.01.

2003, the Royalty shall be [at specified rates].[73]

In 2007, that section was amended, and the references to different countries at different specified rates were removed. The finalized version instead reads, "*[i]n each country of the Territory*, LICENSEE'S Corn Line NK603 Royalty will be the lower of (1) ███████ percent (██%) of industry-standard gross royalty . . . or (2) ██████ percent (██%) of the industry-standard net royalty . . . ."[74]

When comparing the changed language, an answer to the ambiguity reveals itself. These parties amended the royalty terms by removing references to individual countries at different specified rates. The singular section now encompasses royalties "*in each country of*"[75] "United States *and* Canada *and* all other countries of the world."[76] And the new royalty provision sets one percent rate calculation for that defined Territory. It's thus apparent that the parties intended to include all countries under one royalty rate—*not* to provide for country-by-country royalties at different rates. By using one specified percentage to calculate royalties for the Territory as a whole, the parties removed the possibility of treating patent expiration on a country-by-country basis. If the royalties for all worldwide patents are calculated using a set percent rate, then the royalty obligations can end on one patent

---

[73]  Agreement § 4.01 (emphasis added).

[74]  2007 Amendment § 4.01 (emphasis added).

[75]  *Id.*

[76]  Agreement § 2.22 (emphasis added).

expiration date.[77]

Certain other provisions further clue the Court as to the parties' intent. "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[78] In Section 7.06, Corteva granted Monsanto "irrevocable options to *world-wide*, non-exclusive, royalty bearing licenses . . . ."[79] No such reference to a country-by-country royalty bearing license exists. What's more, the Agreement also encompasses "MONSANTO Know-How" and "Biological Materials," not just patent rights. Those licensed non-patent rights continue past any country-specific patent's expiration, so it follows that Corteva's royalty obligations would extend past expiration as well.

Corteva focuses on the royalty provision's "in each of" usage to argue that royalties are owed on a country-by-country basis. But Corteva's interpretation ignores the "Territory" definitional phrasing "United States *and* Canada *and* all other countries of the world." The presumably conjunctive 'and' instead of the disjunctive 'or' combines those listed countries together.[80] Further, the Agreement's Term

---

[77] During argument, Corteva posited that the "industry-standard" royalty rate varies from country to country, indicating an intent to treat each country differently. *See* D.I. 116 (Aug. 13 H'rg Tr.) at 14-15. But what matters here is the calculation, not the result. Because the enumerated percentage calculation treats the countries together, the Agreement treats the royalties together; irrespective of the finalized amount after that calculation is employed.

[78] *E.g.*, *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[79] Agreement § 7.06 (emphasis added).

[80] *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1045 (Del. 2023) ("ordinarily 'and' is conjunctive, while 'or' is disjunctive . . . courts will construe each word accordingly, absent strong

doesn't include any Territory reference at all; the Agreement simply terminates when the last Monsanto patent expires. Thus, Corteva's royalties provision interpretation runs afoul of the Agreement's overall scheme for a worldwide license agreement that continues in full until the last patent expiration date.[81]

Ultimately, these sophisticated parties agreed to a complex licensing arrangement in exchange for royalties owed on patents all around the world. No doubt, the parties knew that the patents in question would expire 20 years post-creation when entering their arrangement. If the parties intended to contract for country-by-country royalties—such that a patent's expiration ended royalties owed only for that country—they were more than capable of including such specific language.[82] Instead, they contracted for one royalty rate calculation for the entire

---

reasons to break from the general rule" (citing *Silverman v. Silverman*, 206 A.3d 825, 832 n.35 (Del. 2019))).

[81] *See E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113 ("the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan" (citing *Stemerman v. Ackerman*, 184 A.2d 28, 34 (Del. Ch. 1962))).

Corteva also argues that, if the Agreement's Term applies to all provisions, then it makes the Agreement's Marking provision unlawful. Pls.' Mot. for Summ. J. at 17-19. That's because, Corteva says, the Marking provision would require Corteva to mark products with expired patents in violation of federal law. *Id.* But the Marking provision states that marking is required only "to the extent such notice is applicable in the respective area[.]" *See* Agreement § 3.03(a). So, the required notice simply wouldn't remain or be "applicable" for expired patents.

[82] More likely, the parties knew that the licenses for some patents would continue after expiration of other countries' patents under the Agreement and set the royalty rate accordingly. Scholars and courts alike have recognized this key component of licensing agreements and royalty payments—that royalty rates are based on the value of the patents during the entire agreement period, including post-expiration—in their criticism of *Brulotte*. *See Scheiber v. Dolby Lab'ys, Inc.*, 293 F.3d 1014, 1017-18 (7th Cir. 2002):

Territory, and for the Agreement to end "*upon the expiration of the last to expire* of the MONSANTO Patent Rights and the Licensed Patent Rights."[83] The Court will enforce the Agreement and those terms as written.[84] When considering extrinsic evidence and the Agreement as a whole, the Agreement imposes royalty payment obligations on all patents until the last one expires.

Accordingly, Bayer's motion for summary judgment is **GRANTED** and Corteva's motion for summary judgment is **DENIED** as to Corteva's Count I.

---

> The *Brulotte* rule incorrectly assumes that a patent license has significance after the patent terminates. When the patent term ends, the exclusive right to make, use or sell the licensed invention also ends. Because the invention is available to the world, the license in fact ceases to have value. *Presumably, licensees know this when they enter into a licensing agreement. If the licensing agreement calls for royalty payments beyond the patent term, the parties base those payments on the licensees' assessment of the value of the license during the patent period.* These payments, therefore, do not represent an extension in time of the patent monopoly . . . .

> Courts do not remove the obligation of the consignee to pay because payment after receipt is an extension of market power—it is simply a division of the payment-for-delivery transaction. Royalties beyond the patent term are no different. If royalties are calculated on post-patent term sales, the calculation is simply a risk-shifting credit arrangement between patentee and licensee. The arrangement can be no more than that, because the patentee at that time has nothing else to sell.

(emphasis added) (quoting Harold See & Frank M. Caprio, *The Trouble with Brulotte: the Patent Royalty Term and Patent Monopoly Extension*, 1990 UTAH L. REV. 813, 814, 851 (1990) and citing Rochelle Cooper Dreyfuss, *Dethroning Lear: Licensee Estoppel and the Incentive to Innovate*, 72 VA. L. REV. 677, 709–12 (1986)).

[83] Agreement § 9.01 (emphasis added).

[84] *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) ("Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written . . . 'parties have a right to enter into good and bad contracts, the law enforces both.' Holding sophisticated contracting parties to their agreement promotes certainty and predictability in commercial transactions." (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010))).

## B. *BRULOTTE* DOESN'T RENDER THE AGREEMENT UNLAWFUL.

Corteva presses on, positing that if the Agreement is construed to require payment of post-patent expiration U.S. royalties beyond November 2022, such a royalties scheme constitutes patent misuse under *Brulotte v. Thys Co.*[85] Corteva contends that the *Brulotte* decision "established a bright-line rule that a licensor of U.S. patent rights cannot require the payment of U.S. royalties after expiration of the licensed U.S. patents . . . ."[86] So, says Corteva, paying royalties on the expired U.S. patent is *per se* unlawful.[87]

Federal law governing patent misuse is well-settled. A patentee has the exclusive right to manufacture, use, and sell her invention.[88] The heart of a patentee's legal monopoly is the right to invoke the State's power to prevent others from utilizing her discovery without her consent.[89] The law also recognizes that the patentee may assign or license others to practice her invention.[90] But there are established limits that the patentee must not exceed in employing the leverage of her

---

[85] Pls.' Mot. for Summ. J. at 19.

[86] *Id.*

[87] *Id.*

[88] *See, e.g.*, *Bement & Sons v. National Harrow Co.*, 186 U.S. 70, 88-9 (1902).

[89] *See, e.g.*, *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 423-24 (1908); *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 33-9 (1923).

[90] *See, e.g.*, *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891).

patent to control or limit the operations of the licensee.[91]  Among other restrictions, the patentee may not condition the right to use her patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of the patent monopoly.[92]  And the patentee's right to set the price for a license does not extend so far as "to exact royalties as high as [s]he can negotiate."[93]

The *Brulotte* decision Corteva references involved a hop-picking machine with several patents.[94]  Brulotte purchased the machine from Thys Co. on a license, requiring Brulotte to pay specified royalties.[95]  Thys's patents then expired.  But the license agreement continued.[96]  Brulotte challenged the license, arguing that it was patent misuse to collect any royalties after the patents' expiration.[97]

The United States Supreme Court agreed, ruling that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*."[98]  In so ruling, the *Brulotte* court noted that "[t]he present licenses draw no

---

[91]  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 135 (1969).

[92]  *E.g.*, *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 455-59 (1940); *International Salt Co. v. United States*, 332 U.S. 392, 395-96 (1947).

[93]  *Brulotte*, 379 U.S. at 33.

[94]  *Id*. at 29.

[95]  *Id*. at 30.

[96]  *Id*.

[97]  *Id*.

[98]  *Id*.

line between the term of the patent and the post-expiration period."[99]  The *Brulotte* court characterized the licensing agreement in question as "a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period."[100]  That conflicted with patent law's policy of establishing a "post-expiration . . . public domain."[101]

As *Brulotte* exemplifies, the United States Supreme Court "has carefully guarded the significance of [a patent's] expiration date, declining to enforce laws and contracts that restrict free public access to formerly patented, as well as unpatentable, inventions."[102]  But more recently in *Kimble v. Marvel Entertainment*, the high court described how "parties can often find ways around *Brulotte*, enabling them to achieve those same ends."[103]

Corteva's attempt to invoke *Brulotte* falls short for the reasons identified by

---

[99]  *Id*. at 32.

[100]  *Id*.

[101]  *Id*. at 33.

[102]  *Kimble*, 576 U.S. at 447 (citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230 (1964) and *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 255–56 (1945)).

[103]  *Id*. at 453.  Notably, the subject agreement in *Kimble* didn't set an end date for royalties either. *See id.* at 450 ("The parties set no end date for royalties, apparently contemplating that they would continue for as long as kids want to imitate Spider-Man (by doing whatever a spider can)").  But that agreement was only for one patent, not multiple patents. *See id.* at 449.  When those parties came across *Brulotte*, litigation ensued in an attempt to render "the royalty provision . . . unenforceable after the expiration of the Kimble patent." *Id*. (quoting *Kimble v. Marvel Enterprises, Inc.*, 692 F. Supp. 2d 1156, 1161 (D. Ariz. 2010)).  As the *Kimble* court clarified— and as about to be discussed—the royalty provision on the Kimble patent likely would have been enforceable if one of the enumerated exceptions applied.

*Kimble*. First and foremost, the operative agreement is a latest-running-patent agreement. The *Kimble* court stated that, "[u]nder *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires."[104] In *Brulotte*, the Court dealt with a U.S. royalty license on seven subject patents.[105] All seven expired, but the issued licenses continued beyond each agreed-upon patent's expiration.[106] Under that factual circumstance, the Court deemed the license agreement unlawful.[107] Contrarily, the subject license agreement between these parties involves a royalty license that lasts until the latest-running patent covered. As the *Kimble* court identified, and other courts have confirmed,[108] royalties under a latest-running-patent license agreement differ from the licensing agreement interpreted in *Brulotte* and are lawful.[109] That's just what we have here.[110]

---

[104] *Id*. at 454.

[105] *Brulotte*, 379 U.S. at 30.

[106] *Id*.

[107] *Id*. at 32.

[108] *See Ares Trading S.A. v. Dyax Corp.*, 2023 WL 2456437, at *24 (D. Del. Mar. 10, 2023) (stating that, "since 'under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires,' *Brulotte* would not apply" until the latest running patent in the subject licensing agreement—the '743 Patent—expires in 2028 (cleaned up) (quoting *Kimble*, 576 U.S. at 454)); *PNY Techs., Inc. v. Netac Tech. Co.*, 2019 WL 459245, at *3 (D.N.J. Feb. 6, 2019) ("The Settlement Agreement is a licensing agreement which covers multiple patents. Under *Kimble* and *Brulotte*, 'royalties may run until the latest-running patent covered in the parties' agreement expires.'" (quoting *Kimble*, 576 U.S. at 454)), *aff'd*, 800 F. App'x 110 (3d Cir. 2020).

[109] *Kimble*, 576 U.S. at 454.

[110] In its motion, Corteva says that *Kimble*'s latest-running-patent exception doesn't apply because the Agreement's latest-running patent is a foreign patent while the expired patent here is a U.S. patent. Pls.' Mot. for Summ. J. at 20 (citing *Scheiber*, 293 F.3d at 1014 and *Zila, Inc. v. Tinnell*, 502 F.3d 1014 (9th Cir. 2007)). But neither cited-to case—both decided before *Kimble*—stands

Second, the patent licenses are tied to additional non-patent rights. The *Kimble* Court pointed out that "parties have still more options when a licensing agreement covers . . . additional non-patent rights" and that "post-expiration royalties are allowable so long as [they are] tied to a non-patent right—even when closely related to a patent."[111] Here, the Agreement granted Corteva a license to patent rights—MONSANTO Patent Rights and Licensed Patent Rights—*and* non-patent rights—Biological Materials and MONSANTO Know-How.[112] Because the post-expiration royalties are tied to non-patent rights, they aren't precluded by *Brulotte*.[113]

In addition, the Agreement bases royalty payments on sales, not use.[114] As such, two factually similar U.S. Supreme Court cases aid this analysis: *Automatic*

---

for Corteva's postulation that U.S. royalties for expired U.S. patents can't be owed on latest-running foreign patents. And *Brulotte* only addresses U.S. patents, not foreign patents, so it can't be said to stand for that proposition either. *See Zila, Inc.*, 502 F.3d at 1023 ("Nor does *Brulotte* extend its royalty-canceling powers to contracts for foreign patents. *Brulotte* concerned patent rights in the United States . . . .").

[111] *Kimble*, 576 U.S. at 454.

[112] *See* Agreement § 3.01.

[113] According to Corteva, for *Kimble*'s non-patent rights exception to apply, there must be some sort of step-down whereby the remaining non-patent rights garner an eroded royalty rate. Pls.' Mot. for Summ. J. at 21-25. But the example provided in *Kimble* that describes a step-down in royalty rate is just that—an example. *Contra Dasso Int'l, Inc. v. Moso N. Am., Inc.*, 2023 WL 5349374 (D. Del. Aug. 21, 2023); *Bradley Corp. v. Lawler Mfg. Co.*, 2020 WL 7027875 (S.D. Ind. Nov. 30, 2020); *Galbraith Lab'ys, Inc. v. Nanochem Sols. Inc.*, 2016 WL 1421004 (W.D. Ky. Apr. 8, 2016). Some lower federal courts have since placed weight on the step-down example, but it is not at all settled that is a requirement to avoid *Brulotte* trouble.

[114] *See* Agreement § 4.01; *see also* 2007 Amendment § 4.01.

*Radio Manufacturing Co. v. Hazeltine Research, Inc.*[115] and *Zenith Radio Corp. v. Hazeltine Research, Inc.*[116]  In both *Automatic Radio* and *Zenith Radio*, the subject license agreements covered hundreds of patents related to the manufacture of radio broadcasting apparatuses.[117]  In *Zenith Radio*, those included both foreign and U.S. patents.[118]  And in both cases, the license agreements provided a percentage royalty rate based on sales in exchange for the patent and non-patent rights.[119]  Both licensees challenged the respective license agreements, asserting patent misuse.[120]

In *Automatic Radio*, the Supreme Court considered the "payment of royalties according to an agreed percentage of the licensee's sales" reasonable, since "[s]ound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement."[121]  The Court found that, in that type of royalty provision, there is "no inherent extension of the monopoly of the patent" because "[w]hat it acquired by the agreement into which it entered was the privilege to use any or all of the patents and developments as it desired to use them.  If it chooses to use none of them, it has

---

[115] 339 U.S. 827 (1950), *overruled on other grounds by Lear v. Adkins*, 89 U.S. 653 (1969).

[116] 395 U.S. 100 (1969).

[117] *Automatic Radio Mfg. Co.*, 339 U.S. at 829; *Zenith Radio Corp.*, 395 U.S. at 104-05.

[118] *Zenith Radio Corp.*, 395 U.S. at 104.

[119] *Automatic Radio Mfg. Co.*, 339 U.S. at 829; *Zenith Radio Corp.*, 395 U.S. at 104.

[120] *Automatic Radio Mfg. Co.*, 339 U.S. at 829-30; *Zenith Radio Corp.*, 395 U.S. at 104-05.

[121] *Automatic Radio Mfg. Co.*, 339 U.S. at 834.

nevertheless contracted to pay for the privilege . . . ."[122]  And the *Zenith Radio* court affirmed that analysis, stating that "in licensing the use of patents 'it is not a *per se* misuse of patents to measure the consideration by a percentage of the licensee's sales."[123]  The *Zenith Radio* court also confirmed that *Automatic Radio* is "not to the contrary" of *Brulotte*'s ban on post-expiration royalties.[124]

The present facts are akin to those in *Automatic Radio* and *Zenith Radio*. These parties contracted for a global licensing agreement spanning multiple patents, along with non-patent 'know-how' and 'biological materials' rights.  And the parties agreed to a set sales percentage as consideration for that license.  As the licensee, Corteva obtained the benefit of that bargain by gaining access to both the patents and the corresponding research throughout the Agreement period.  Bayer didn't exercise patent leverage in an attempt to extend its patent monopoly; it simply contracted for a "convenient method" for royalties based on sale totals.[125]  As the *Zenith Radio* court observed, "[i]f convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license."[126]  Just so here.

---

[122] *Id.*

[123] *Zenith Radio Corp.*, 395 U.S. at 137-38 (quoting *Automatic Radio Mfg. Co.*, 339 U.S. at 834).

[124] *Id.* at 137.

[125] *See id.*

[126] *Id.* at 138.

At bottom, Corteva's *Brulotte* arguments fail because the Agreement is a latest-running-patent agreement that is tied to additional non-patent rights. *Kimble* makes it clear that such agreements are enforceable. And the royalty provisions grant Corteva the privilege to use its contracted-for rights, whether patent-related or not. Payment for that privilege doesn't constitute patent misuse.

Bayer's summary judgment motion is **GRANTED** and Corteva's summary judgment motion is **DENIED** as to Corteva's Count II.

## V. CONCLUSION

Under the Agreement as it is now in place, one royalty rate calculation applies to all worldwide patents. So, those worldwide patents are treated together for royalty purposes. Because the Agreement's term ends when the last country's patent expires, the royalty provision thus extends royalties owed on all patents—whether expired in a specific country or not—until that final expiration occurs.

The Agreement is a latest-running-patent agreement and Corteva contracted and has been paying for the privilege to use both the patents and certain corresponding research for the Agreement's entire term. With that (and for the reasons mentioned above) the Agreement's royalty provisions as crafted isn't unlawful under *Brulotte*.

Resultingly, Defendants' Motion for Summary Judgment is **GRANTED**, in whole, and Plaintiffs' Motion for Summary Judgment is **DENIED**, in whole.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____
Paul R. Wallace, Judge

Original to Prothonotary

cc: All Counsel via File and Serve